[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Blanton*, Slip Opinion No. 2022-Ohio-3985.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-3985

THE STATE OF OHIO, APPELLEE, *v*. BLANTON, APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Blanton*, Slip Opinion No. 2022-Ohio-3985.]

*Criminal law—R.C. 2953.21—Postconviction-relief petitions—Ineffective assistance of counsel—Res judicata—Postconviction claims alleging a denial of the constitutional right to effective assistance of counsel are not barred by res judicata if the claims cannot be meaningfully reviewed without resorting to evidence outside the trial record—Court of appeals' judgment affirmed.*

(No. 2021-0172—Submitted March 8, 2022—Decided November 10, 2022.)

APPEAL from the Court of Appeals for Adams County,

Nos. 19CA1096 and 19CA1097, 2020-Ohio-7018.

_____

**DEWINE, J.**

{¶ 1} What if you have been convicted of a crime and believe the reason you were convicted is that your trial attorney did a lousy job? When can you

challenge that conviction on the basis of the attorney's performance? When must you do it on direct appeal—and when may you do it in a petition for postconviction relief? This case is about those rules.

**{¶ 2}** The doctrine of res judicata bars someone from raising a claim that could have been raised and litigated in a prior proceeding. *State v. Perry*, 10 Ohio St.2d 175, 180, 226 N.E.2d 104 (1967). So a court reviewing a postconviction-relief petition generally may not decide a claim that could have been presented at trial and raised on direct appeal. *Id.* at 180. There's a twist when it comes to claims of ineffective assistance of counsel. We have held that res judicata does not bar a postconviction ineffective-assistance-of-counsel claim when either (1) the petitioner had the same attorney at trial and on appeal or (2) he must rely on evidence outside the trial record to establish his claim for relief. *State v. Cole*, 2 Ohio St.3d 112, 113-114, 443 N.E.2d 169 (1982). The converse is that when the petitioner had a new attorney on appeal and the claim could have been litigated based on the trial record, res judicata applies and the postconviction claim is barred. *Id*.

**{¶ 3}** Denny Blanton, the postconviction petitioner in this case, asks us to change our rules. He would like for us to say that res judicata never applies to postconviction ineffective-assistance-of-counsel claims. In this view, one could always raise a postconviction claim of ineffective assistance of counsel even when the claim could have been raised and addressed on direct appeal. We conclude that it is best to stick with our existing rules.

**{¶ 4}** Applying these rules, we go through each of Blanton's postconviction claims. We determine that he is not entitled to a hearing on any of them. The court of appeals analyzed some of the claims differently than we do, but it ultimately reached the same result. So we affirm its judgment.

## I.  BLANTON'S TRIALS

### A.  *The rape case*

{¶ 5} When he was a senior in high school, Blanton, who was 18 years old at the time, was accused of kidnapping and raping J.S., a 15-year-old freshman girl. The matter proceeded to a jury trial in the Adams County Court of Common Pleas, at which the following evidence was presented.

{¶ 6} J.S. ran track and cross-country for her high school.  By her account, she was covering her usual training route on a country road one February afternoon when Blanton pulled over in his pickup truck and asked her for directions.  He got out of his truck, ostensibly to show her a map.  But after approaching J.S., he shoved her to the ground, punched her in the face, and bound her arms with his belt.  Then he ordered her into the back seat of his truck and drove to a cemetery.  Once there, Blanton climbed into the back seat of the truck, where he forced J.S. to put her mouth on his penis and then vaginally raped her.

{¶ 7} J.S. recounted that after the episode was over, she made conversation with Blanton to keep him calm.  He asked her if she had "enjoyed it?"  Out of fear, she said "yes."  Finally, Blanton dropped J.S. off on the side of the road and told her not to tell anyone what had happened.  He gave her a fist bump as she got out of the truck.

{¶ 8} Blanton told a different story.  He testified that J.S. had waved at him, appearing to be "out of breath" and "in some type of distress."  He offered her a ride, and she climbed into the back seat.  J.S. then suggested that they pull over near the cemetery and invited Blanton to join her in the back seat.  When he got in the back seat, she began rubbing his leg.  He asked if she would give him a "blow job," and she did.  Then she asked if he wanted to have sex, which led to a consensual sexual encounter.

{¶ 9} Blanton said he had intended to drive J.S. home afterward.  But on the way, J.S. suggested they stop for doughnuts at a local bakery.  Blanton refused,

telling her that he had to meet his girlfriend. Blanton said that at that point, J.S.'s "whole demeanor changed" and she told him to let her out on the side of the road.

{¶ 10} Blanton dropped J.S. off near a house. J.S. related that once he was out of sight, she "took off sprinting" toward the bakery, which was about a third of a mile away. But when she approached, the bakery looked to be closed, so she decided to go to the house next door instead. J.S. spotted a girl bringing laundry into the house and asked the girl if she could use the family's outdoor phone. J.S. called her mother to come get her and then waited for her at the end of the driveway, next to the bakery sign.

{¶ 11} The girl said that when she first saw J.S., J.S. was sitting on some red stones by the bakery sign, with her head down on her knees. J.S. eventually walked up the drive, and the girl could see that she had been crying. After making a call, J.S. went back to sit on the stone blocks at the end of the drive.

{¶ 12} J.S.'s mother took her to the emergency room at Adams County Regional Medical Center, where she underwent a rape examination. J.S.'s hymen was torn, and she was bleeding from her vagina. Her left cheek was red and swollen, she had marks on her back and arms, and there was dirt on her legs. Two days later, J.S. was interviewed by a social worker and examined by a physician at the Mayerson Center at Cincinnati Children's Hospital. Subsequent testing revealed the presence of Blanton's DNA in semen found on J.S.'s shorts. Testing also showed that he could not be excluded as a contributor to seminal fluid found on swabs taken from J.S.'s vaginal and anal cavities.

{¶ 13} Police questioned Blanton the day after the attack. He admitted that he had given J.S. a ride but denied having had any physical contact with her. Blanton claimed at trial that he had lied to the police about having sex with J.S. because he didn't want his girlfriend to find out he had cheated on her.

{¶ 14} The jury returned guilty verdicts on the rape and kidnapping charges. Blanton appealed his convictions to the Fourth District Court of Appeals, which

affirmed. *State v. Blanton*, 4th Dist. Adams No. 16CA1031, 2018-Ohio-1275.

### B. The jail case

{¶ 15} While he was being held in jail on the rape charges, Blanton and two other inmates beat up Gary Lunsford, one of their cellmates. Lunsford told authorities that after the attack, Blanton and the others prevented him from seeking medical assistance for his injuries. Blanton was charged with felonious assault and kidnapping for his role in the attack on Lunsford. The trial court conducted a second jury trial on the charges stemming from Blanton's conduct while in jail.

{¶ 16} Trial testimony revealed that Blanton and six other inmates in his cell block had participated in a "fight club." Blanton and two others, Devon Michael and Zack McKee, organized the matches. In the two weeks leading up to the attack on Lunsford, fights took place nearly every day. Lunsford, in his telling, was reluctant to participate; but Blanton, Michael, and McKee told him that if he didn't, they would make him fight all three of them at once. Lunsford said the three would often "congregate together" and that he "knew something was going to happen, [but not] to who or what."

{¶ 17} One afternoon, Lunsford and another inmate wrestled while Blanton refereed. After they took a break, McKee walked up and "sucker punched" Lunsford. Michael joined in, and he and McKee forced Lunsford to the floor, taking turns kicking and punching him in his head and body. Once Michael and McKee had finished with him, Blanton walked over and punched Lunsford some 15 times in the head as he lay on the floor. A video of the attack shows that Lunsford was not moving much, if at all, during Blanton's initial attack.

{¶ 18} After some time, Lunsford tried to get up. Blanton quickly ran over and delivered swift blows to Lunsford's head. Then Blanton backed Lunsford up against the wall and began pummeling him with his fists. Lunsford stumbled away and fell to the floor, motionless. Michael and McKee joined back in and stomped on Lunsford a few more times. The three attackers circled Lunsford as he lay on

the ground. Each time Lunsford tried to stand, they knocked him back down. This went on until Lunsford finally collapsed onto one of the bunks.

**{¶ 19}** Lunsford said he did not remember much of the assault, because he had been "knocked unconscious" and was "incapacitated." Another cellmate recounted: "I seen he was wrapped up in a ball with his hands over his face and then he was kicked in the back of his head and then his arms went limp. He was out for a few seconds and then he come back to."

**{¶ 20}** Lunsford maintained that he did not immediately tell jail personnel that he had been hurt because he "wasn't permitted to" by his three attackers. He stayed in his bunk, and he covered his head with a blanket whenever a guard walked by. A fellow inmate brought him his food when the cafeteria trays were delivered. Lunsford's trio of attackers threatened that he would "get the same treatment again if [he] tried to hit the call box."

**{¶ 21}** After a couple days of this, a corrections officer told Lunsford to get out of his bunk and pick up his tray at the cell's door. She saw that he had been beaten up and took him out of the cell. Lunsford had significant visible injuries: two black eyes; a busted lip; bruising on his face, neck, stomach, and back; and a gash on his head. He was taken to the hospital, where an emergency-room doctor concluded that he had sustained a concussion.

**{¶ 22}** Blanton did not testify in his defense. A jury found him guilty of felonious assault and kidnapping for his attack on Lunsford. Blanton appealed those convictions, and the Fourth District affirmed. *See State v. Blanton*, 2018-Ohio-1278, 110 N.E.3d 1 (4th Dist.).

## II. POSTCONVICTION PROCEEDINGS UNDER OHIO LAW

**{¶ 23}** Blanton subsequently filed petitions for postconviction relief, challenging his convictions in both the rape case and the jail case. Before we get to his claims, we provide an overview of Ohio's postconviction-review process.

6

### A. The postconviction-relief statute

{¶ 24} Ohio law permits a person convicted of a crime to petition the trial court for an order setting aside his conviction on the basis that "there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States." R.C. 2953.21(A)(1)(a)(i). Before a trial court may grant a hearing on a petition, it must evaluate the petition in the context of the entire record in the case to determine whether the petition alleges "substantive grounds for relief." R.C. 2953.21(D). A petition presents substantive grounds for relief when it contains allegations that are sufficient to state a constitutional claim and the files and records of the case do not affirmatively disprove the claim. *State v. Milanovich*, 42 Ohio St.2d 46, 50, 325 N.E.2d 540 (1975); R.C. 2953.21(F). If the trial court dismisses a petition on the basis that it fails to allege substantive grounds for relief, the court must include findings of fact and conclusions of law explaining the reasons for that decision. R.C. 2953.21(D).

### B. Application of res judicata in postconviction-relief proceedings

{¶ 25} Under the doctrine of res judicata, "a final judgment of conviction bars the convicted defendant from raising and litigating in any proceeding, except an appeal from that judgment, any [claim] that was raised or could have been raised by the defendant at the trial which resulted in that judgment of conviction or on an appeal from that judgment." *Perry*, 10 Ohio St.2d at 180, 226 N.E.2d 104. *Perry* was one of the first cases in which this court construed Ohio's postconviction-relief statutes. The question was whether res judicata applied to claims for postconviction relief. *See id.* at 178-180. In other words, could a petitioner use the postconviction-relief process to relitigate claims that could have been or already were decided in the petitioner's direct appeal?

{¶ 26} We said no. We noted that the postconviction-relief statute had caused some confusion because it referred to convictions that were "void or

voidable" as a result of a constitutional violation. *Id*. at 178-179. But we explained that while the term "voidable" often refers to a conviction that can be vacated on direct appeal, it could also be used to refer to a conviction that can be set aside after it becomes final following a direct appeal. *Id*. at 179-180. We thus rejected the notion that the postconviction statute allowed relitigation of claims that could have been raised at trial or on direct appeal. Such a reading, we explained, "would be wholly inconsistent with the doctrine of res judicata." *Id.* at 179. And because there was nothing else in the statute—beyond the use of the word "voidable"— evincing an intent by the General Assembly to abolish the doctrine of res judicata in collateral postconviction proceedings, we concluded that the doctrine still applied. *Id*.

{¶ 27} As an example of a conviction that was voidable on collateral review, this court pointed to the conviction at issue in *McMullen v. Maxwell*, 3 Ohio St.2d 160, 209 N.E.2d 449 (1965). *Perry* at 179-180. *Maxwell* involved a claim that the prosecution had failed to turn over exculpatory evidence during the defendant's trial. *Id.* at 165. Because the defendant did not learn of the alleged constitutional violation until after he had been convicted, he could not have raised the issue at trial and, in turn, the error could not have been reviewed in a direct appeal. In *Perry*, we noted that in such a scenario, the claim "could not reasonably be said to have been either waived by the prisoner or adjudicated against the prisoner" in the prior proceedings. *Id.* at 179. The *Perry* court therefore held that res judicata bars a petitioner from raising a claim in a petition for postconviction relief unless he can show that the claim "could not have been fully adjudicated by the judgment of conviction and an appeal therefrom." *Id*. at 182.

{¶ 28} Adhering to that rule, this court later explained that "[i]f the trial court finds, on the facts of a case, that a petitioner's claim was fully litigated at trial or upon appeal, or that the claim could have been fully litigated in an appeal, the court can summarily dismiss the claim as barred by res judicata." *State v. Lester*,

41 Ohio St.2d 51, 55, 322 N.E.2d 656 (1975). The trial court must issue findings of fact and conclusions of law specifying "the portions of the files and records which establish the bar of res judicata." *Id.*

*C. Postconviction review of ineffective-assistance-of-counsel claims in Ohio*

{¶ 29} Postconviction-relief petitions raising claims of ineffective assistance of counsel pose unique challenges. Because criminal defendants rely on their trial counsel to develop the trial record, it is often the case that counsel's failures in representation are not preserved in the record. In addition, when a defendant is represented by his trial counsel on appeal, counsel may be reluctant or unable to point out on appeal his own deficiencies at trial. We have thus refined our doctrine in the context of postconviction claims of ineffective assistance of counsel.

{¶ 30} Our seminal case on this issue is *Cole*, 2 Ohio St.3d 112, 443 N.E.2d 169. There, we reiterated the general rule that res judicata bars a claim that " 'was *raised or could have been raised*' " during trial or on appeal from the judgment of conviction. (Emphasis added in *Cole*.) *Id.* at 113, quoting *Perry*, 10 Ohio St.2d 175, 226 N.E.2d 104, at paragraph nine of the syllabus. But at the same time, we acknowledged that special considerations apply with respect to postconviction ineffective-assistance-of-counsel claims that " 'depend[] upon factual allegations that cannot be determined by examination of the files and records of the case.' " *Id.* at 113, fn. 1, quoting *Milanovich*, 42 Ohio St.2d 46, 325 N.E.2d 540, at paragraph one of the syllabus. Thus, we set forth the following rule: "Where [a] defendant, represented by new counsel upon direct appeal, fails to raise therein the issue of competent trial counsel and said issue could fairly have been determined without resort to evidence dehors the record, res judicata is a proper basis for dismissing [the] defendant's petition for postconviction relief." *Id.* at syllabus.

{¶ 31} In *Cole*, we explained that "[g]enerally, the introduction in an R.C. 2953.21 petition of evidence dehors the record of ineffective assistance of counsel

is sufficient, if not to mandate a hearing, at least to avoid dismissal on the basis of res judicata." *Id.* at 114. The court in *Cole* also made clear that simply overcoming the res judicata bar through the introduction of evidence outside the record is not sufficient to entitle the petitioner to a hearing. Rather, to secure a hearing, a petitioner "must proffer evidence which, if believed, would establish not only that his trial counsel had substantially violated at least one of a defense attorney's essential duties to his client but also that said violation was prejudicial to the [petitioner]." *Id.*

{¶ 32} In *Cole*, this court discounted the evidence presented, noting that "the allegations outside the record upon which appellant relies appear so contrived, when measured against the overwhelming evidence in the record of trial counsel's competence, as to constitute no credible evidence and, thus, to justify the trial court's application of the principles of res judicata." *Id.* While the *Cole* court couched its holding in terms of "justify[ing]" the lower's court's use of res judicata, *id.*, a better understanding of the holding in *Cole* is simply that the evidence in that case did not present a substantive claim for relief.

{¶ 33} Thus, in cases such as this, *Cole* mandates a two-part inquiry to determine whether a petitioner who brings forth evidence outside the record of ineffective assistance of counsel is entitled to a hearing. Has the petitioner introduced competent evidence of ineffective assistance that was not included in the trial record? And if so, does that evidence present substantive grounds for relief; that is, if believed, would the newly presented evidence—together with any evidence in the trial record—establish that counsel was ineffective?

{¶ 34} It sometimes happens that courts conflate these two inquiries and hold that a claim that relies on evidence outside the trial record is barred by res judicata because, even if believed, that evidence would not establish that counsel was ineffective. Indeed, the courts below made this error in several instances. The better practice is to treat these two inquiries as analytically distinct.

### III.  WE ADHERE TO THE RULE IN *COLE*

{¶ 35} Blanton asks us to overrule *Cole*.  He proposes that we replace it with the rule used by the federal courts, which allows an ineffective-assistance claim to be raised in a petition for postconviction relief even if it could have been fairly adjudicated in a direct appeal.  *See Massaro v. United States*, 538 U.S. 500, 123 S.Ct. 1690, 155 L.Ed.2d 714 (2003).

{¶ 36} In *Massaro*, the United States Supreme Court resolved a split in the federal circuit courts and held that a petitioner's claim that he had been denied effective assistance of counsel could be brought in a collateral proceeding under 28 U.S.C. 2255—the federal postconviction-review statute—regardless of whether the claim could have been resolved in a direct appeal.  *Massaro* at 504-505.  Although the court concluded that an ineffective-assistance claim may still be brought on direct appeal, it eliminated the requirement in federal courts that such a claim *must* be brought on direct appeal when it can be fully addressed based on the trial record. *Id*. at 508-509.

{¶ 37} The court reached its decision in *Massaro* after noting many of the same concerns that this court has recognized in its own caselaw.  For instance, the *Massaro* court expressed concern that the trial record often will not contain the information necessary to fairly review an ineffective-assistance claim on direct appeal.  *See id.* at 504-505.  And the court recognized that even meritorious claims could fail on direct appeal without adequate support in the trial record.  *Id*. at 506. Under its approach, the court explained, ineffective-assistance claims will most often be litigated in a forum that allows the development of facts necessary to support the claim.  *Id*. at 505.

{¶ 38} We find these concerns to be adequately addressed under Ohio's current rule.  The rule in *Cole* does not bar all ineffective-assistance claims that were previously raised in a direct appeal.  Rather, it permits petitioners who present a claim of ineffective assistance and who demonstrate through evidence outside the

trial record that their claim either was not or could not have been fairly adjudicated in a direct appeal to have a *second* opportunity to litigate the claim.

**{¶ 39}** We acknowledge the *Massaro* court's concerns that this approach may lead to inefficiencies, in that courts reviewing postconviction claims will have to conduct a res judicata analysis before reaching the merits of a claim, and some claims will potentially be litigated twice. *See Massaro*, 538 U.S. at 506-507, 123 S.Ct. 1690, 155 L.Ed.2d 714. But the federal approach creates its own inefficiencies by forcing trial courts to conduct additional proceedings (and appellate courts to review additional appeals) to address claims that could have been resolved as part of a direct appeal.

**{¶ 40}** In our view, the rule in *Cole*, 2 Ohio St.3d 112, 443 N.E.2d 169, strikes a sensible balance. It promotes efficiency by requiring litigants to pursue their claims at the first available opportunity. Some ineffective-assistance claims— say, a claim based on counsel's failure to object to obviously prejudicial evidence— can fairly be resolved on appeal based on evidence entirely within the trial record. It would make little sense to postpone the resolution of such claims until after proceedings on a postconviction-relief petition.

**{¶ 41}** At the same time, the *Cole* rule protects the rights of petitioners by allowing postconviction review of ineffective-assistance claims that truly depend on evidence outside the trial record (for example, a claim regarding counsel's failure to present evidence). Indeed, under the current rule, claims that rely on evidence outside the record may be heard on postconviction review even if similar claims have been previously raised and adjudicated against the petitioner in his direct appeal. *See, e.g.*, *State v. Smith*, 17 Ohio St.3d 98, 101, 477 N.E.2d 1128 (1985), fn. 1 (rejecting an ineffective-assistance claim based on the limited record available in the direct appeal but noting that res judicata would not bar the appellant from presenting additional evidence in a subsequent postconviction proceeding).

**{¶ 42}** It is true that most states do not bar a postconviction ineffective-

12

assistance claim even if the claim could have been decided in a direct appeal. *See, e.g.*, *Commonwealth v. Grant*, 572 Pa. 48, 67-68, 813 A.2d 726 (2002), *abrogated on other grounds by Commonwealth v. Bradley*, 261 A.3d 381 (Pa.2021); *State v. Fraser*, 2000 ND 53, 608 N.W.2d 244, ¶ 23; *People v. Mendoza Tello*, 15 Cal.4th 264, 266-267, 933 P.2d 1134 (1997); *State v. Gonzalez*, 205 Conn. 673, 683-684, 535 A.2d 345 (1987). Others, though, continue to apply res judicata to ineffective-assistance claims that are capable of resolution in a direct appeal. *See, e.g.*, *State v. Abdullah*, 289 Neb. 123, 128-129, 853 N.W.2d 858 (2014); *Robledo-Kinney v. State*, 637 N.W.2d 581, 585 (Minn.2002).

{¶ 43} Our general rule applying res judicata to postconviction-relief claims is premised on this court's long-time understanding that the language of Ohio's postconviction-relief statute does not displace common-law principles of res judicata. *See Perry*, 10 Ohio St.2d at 179, 226 N.E.2d 104. And our application of that rule to situations in which an ineffective-assistance claim can be fairly litigated in a direct appeal preserves judicial resources while still protecting a petitioner's ability to present additional evidence in support of an ineffective-assistance claim in a collateral proceeding. We therefore adhere to our precedent and decline the invitation to overrule *Cole*.

## IV. BLANTON'S POSTCONVICTION CLAIMS

{¶ 44} Having reaffirmed our traditional standard for determining whether a postconviction ineffective-assistance-of-counsel claim is barred by res judicata, we proceed to address Blanton's postconviction claims. We recognize that courts have sometimes struggled with the application of res judicata to postconviction ineffective-assistance claims. And we acknowledge the concern expressed by some of the amici curiae in this case that, in practice, the doctrine is often applied in an overly expansive manner. It is our hope that our analysis of the claims in this case will help guide courts in future cases.

### A. *Postconviction proceedings in the rape case*

{¶ 45} Blanton's postconviction-relief petition in the rape case asserted that his convictions should be vacated on the ground that he was denied his constitutional right to effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution.[1]  To establish ineffective assistance, he must demonstrate that his counsel's representation was deficient and that he was prejudiced as a result.  *See Strickland v. Washington*, 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus.

{¶ 46} Blanton's petition alleged that his counsel performed deficiently in the following respects: (1) by failing to present his defense of consent earlier in the trial, (2) by failing to file an affidavit of disqualification against the trial-court judge, (3) by not presenting expert testimony regarding the origin of mud on J.S.'s shorts and the possibility that the injuries to J.S.'s genital region could have been sustained during consensual sex, (4) by telling the jury that the defense planned to call Blanton's girlfriend as a witness and then failing to follow through, and (5) by not moving for a change of venue.  Additionally, he asserted that the cumulative effect of these purported errors undermines confidence in the verdict and warrants a new trial.

{¶ 47} To support his petition in the rape case, Blanton submitted affidavits and other evidence outside the trial record.  The trial court determined that all the claims either were or could have been addressed in Blanton's direct appeal.  Thus, the court concluded that res judicata applied to each claim and dismissed Blanton's petition without affording him an evidentiary hearing.

{¶ 48} Blanton appealed the trial court's decision, and the Fourth District affirmed.  2020-Ohio-7018.

---

1. Blanton's petition did not argue a violation of his rights under the Ohio Constitution, so we have no occasion to consider that document here.

### 1. Counsel's failure to raise consent at the outset

{¶ 49} Blanton's first claim for postconviction relief in the rape case takes aim at his counsel's opening statement to the jury. He charges that his attorney was ineffective because he did not tell the jury at the outset that Blanton had admitted to having consensual sex with J.S. Instead, counsel simply told the jury that the state had to prove all the elements of the crimes. This, Blanton asserts, gave the jury the false impression that he changed his story after hearing the evidence against him. And Blanton maintains that counsel's attack-all-elements approach was unreasonable because the only viable defense was one of consent.

{¶ 50} Part of what Blanton relies on to support this claim is evidence of an outside-the-record conversation between him and his counsel. In his affidavit supporting his petition, Blanton says that he told his counsel during their first meeting that he had had consensual sex with J.S. and that he lied to police about having sex with her because he did not want his girlfriend to find out. Blanton claims he asked his counsel to notify the prosecutor and to arrange a second interview so he could set the record straight, but that his counsel disagreed with that course of action. Blanton's petition also includes a copy of a text exchange between his mother and one of his attorneys, in which the attorney remarked that "it was probably about two weeks after" the incident that Blanton told him that the sex was consensual.

{¶ 51} The Fourth District held that this claim was barred by res judicata, noting that the trial court had pointed to evidence in the record through which the argument could have been made and opining that it need not accept the assertions in Blanton's affidavit as true. 2020-Ohio-7018 at ¶ 21-22. The Fourth District was incorrect in suggesting that the claim could have been litigated on direct appeal. The evidence about what Blanton had told his counsel is not in the trial record, and it was central to his claim: without it one could not know whether Blanton's attorneys were aware of what he intended to say prior to his taking the stand.

**{¶ 52}** The problem, though, is that even if one accepts what Blanton said in his affidavit as true, he failed to preserve his argument on the remaining merits of his claim of ineffective assistance of counsel. The trial court found that on the merits, Blanton's claim did not overcome the presumption of reasonable professional assistance. And it further concluded that Blanton's allegations of prejudice—particularly, his contention that the state might have investigated and presented the case differently had his counsel informed the prosecutor of the consent defense—were "speculative at best" and failed to show a reasonable probability of a different outcome. In other words, the trial court found that the evidence, "if believed," did not establish a "violation [that] was prejudicial to the defendant," *Cole*, 2 Ohio St.3d at 114, 443 N.E.2d 169.

**{¶ 53}** The Fourth District affirmed this conclusion. 2020-Ohio-7018 at ¶ 21. In his memorandum in support of jurisdiction to this court, Blanton did not set forth any proposition of law challenging the court of appeals' judgment in this regard. Thus, that portion of the court of appeals' judgment is not before us. *See Estate of Ridley v. Hamilton Cty. Bd. of Mental Retardation & Dev. Disabilities*, 102 Ohio St.3d 230, 2004-Ohio-2629, 809 N.E.2d 2, ¶ 27, citing *In re Timken Mercy Med. Ctr.*, 61 Ohio St.3d 81, 87, 572 N.E.2d 673 (1991). Accordingly, we affirm the judgment of the court of appeals with respect to this claim.

### 2. Counsel's failure to present expert testimony

**{¶ 54}** Blanton's postconviction-relief petition also asserts that his trial counsel provided ineffective assistance by failing to call expert witnesses. He says his counsel should have called experts to testify on two matters: (1) the origin of mud found on the shorts worn by J.S. during the encounter and (2) the nature of the injuries to J.S.'s genitals.

#### a. Expert testimony regarding mud on J.S.'s shorts

**{¶ 55}** J.S. had recounted that Blanton pushed her to the ground before abducting her. One of the photographs taken by a sexual-assault nurse examiner at

the hospital depicted dirt on J.S.'s lower legs. Further, the shirt and shorts that J.S. wore during the encounter had dirt stains on them.

{¶ 56} Before trial, Blanton's attorneys sought independent testing of J.S.'s shorts. They hoped to rebut her statement that she had been pushed to the ground and show instead that she had simply been splattered with mud while running. An expert in microscopy examined the shorts and provided a report to Blanton's counsel. The report concluded that some of the mud stains appeared to have straight edges. The expert therefore opined—contrary to what the defense had hoped—that those stains were impressions from "contact with the surface of a muddy object" and not "mud splashes." Blanton's counsel did not present any evidence or testimony regarding the report at trial.

{¶ 57} In his postconviction-relief petition, Blanton asserts that his counsel was ineffective for not calling the microscopy expert to testify about those findings. Blanton's argument is based on a new theory about the import of the stains. He points out that in J.S.'s account of being pushed to the ground, she never mentioned having hit a hard object. Rather, Blanton contends, the expert's conclusions align with the account of the girl who let J.S. use her family's phone, who said that J.S. had sat on some stone blocks by the sign at the end of the driveway prior to approaching the house. During her trial testimony, J.S. was not asked about and did not mention sitting on the stones (though she did say she waited for her mother by the sign after calling her). In light of this supposed omission, Blanton asserts that the microscopy evidence would have undermined J.S.'s credibility.

{¶ 58} The Fourth District held that this claim was raised in Blanton's direct appeal and was therefore barred by res judicata. 2020-Ohio-7018 at ¶ 27. This was incorrect: the claim wasn't raised in the direct appeal. *See Blanton*, 2018-Ohio-1275. But even if it had been, that would not necessarily determine the matter. The question is whether the claim could have been fully addressed in the direct appeal or whether its adjudication required evidence outside the trial record. *See Cole*, 2

Ohio St.3d 112, 443 N.E.2d 169, at syllabus.

{¶ 59} The state contends that dismissal on res judicata grounds was proper because the expert report was *known* to Blanton at the time of his direct appeal. The state points to appellate caselaw stating that res judicata bars a postconviction claim when the claim is based on evidence that was available to the defense at the time of trial. *See, e.g.*, *State v. Adams*, 11th Dist. Trumbull No. 2003-T-0064, 2005-Ohio-348, ¶ 39 ("For a defendant to avoid dismissal of the petition by res judicata, the evidence supporting the claims in the petition must be competent, relevant, and material evidence outside the trial court's record, *and it must not be evidence that existed or was available for use at the time of trial*" [emphasis added]); *but see id.* at ¶ 65 (res judicata did not bar an ineffective-assistance claim based on outside-the-record evidence that was known to the defense at the time of trial).

{¶ 60} The language on which the state relies sets forth the general rule of res judicata. But that is not the rule we apply to postconviction claims alleging ineffective assistance of trial counsel. There is no requirement that to overcome a res judicata bar, the evidence on which such a claim is based must have been unknown or unavailable to the defense at trial. Indeed, the very premise of this sort of ineffective-assistance claim is that counsel erred by failing to present exculpatory evidence that was available to him. When the trial record does not demonstrate the existence of such evidence, a defendant would not have been able to raise such a claim on direct appeal. Accordingly, such a claim may properly be brought in a postconviction-relief petition.

{¶ 61} The Fourth District erred in holding that this ineffective-assistance claim was barred by res judicata. But again, we are unable to reverse its judgment, because both of the lower courts concluded that the evidence did not establish that Blanton was prejudiced. The trial court observed that the expert's conclusion that the shorts had come into contact with a muddy object did not necessarily contradict the state's theory that Blanton had pushed J.S. to the ground. It therefore

18

determined that counsel's decision not to present the expert—whose testimony was of limited relevance at best—was reasonable trial strategy. In other words, even if believed, the evidence still does not present a substantive ground for relief. *See Cole*, 2 Ohio St.3d at 114, 443 N.E.2d 169. And the court of appeals affirmed the trial court's conclusions on that point. 2020-Ohio-7018 at ¶ 27. Blanton has not appealed that portion of the court of appeals' judgment, so we have no occasion to revisit it. *See Estate of Ridley*, 102 Ohio St.3d 230, 2004-Ohio-2629, 809 N.E.2d 2, at ¶ 27.

### b. *Expert testimony regarding J.S.'s injuries*

{¶ 62} A physician examined J.S. at the Mayerson Center two days after the attack. According to the doctor, J.S.'s hymen was bruised. She also had an abrasion on a portion of her vaginal wall, which meant that a layer of the vaginal tissue was missing. In addition, J.S. was still bleeding at the time of her examination. The duration of J.S.'s bleeding, along with the "pain in her genital area and then extensive bruising and other injury to her genital tissues," does not typically occur in a consensual sexual encounter, testified the doctor.

{¶ 63} Blanton contends that his attorneys were ineffective because they did not counter J.S.'s physician's testimony by putting on an expert who would say that J.S.'s injuries were consistent with consensual sex. Blanton has averred that his attorneys did not even discuss the possibility of retaining an expert to review J.S.'s medical records for this purpose.

{¶ 64} Blanton supported his petition with the affidavit of Dr. Fred Mushkat, an emergency-medicine doctor and American College of Emergency Physicians Fellow. Dr. Mushkat cited medical research concluding that the reliance on genital injuries as an indicator of forced sexual relations is "very much disputed." Attached to Dr. Mushkat's affidavit was a copy of a medical journal article reviewing literature on the topic. The article concluded: "This review of adult female genital injury following consensual and nonconsensual intercourse

identified that genital injuries occur in both subject categories. No consensus exists regarding the number of injuries or injury type (e.g., redness, swelling, ecchymoses, and bruising) that would allow a clinician to determine consent during intercourse." Anderson & Sheridan, *Female Genital Injury Following Consensual and Nonconsensual Sex: State of the Science*, 38 J. Emergency Nursing 518, 521 (2012).

**{¶ 65}** Blanton asserted a similar claim in his direct appeal. There, he contended that his trial attorneys had been deficient by failing to either cross-examine the Mayerson Center physician about medical research suggesting that the types of injuries sustained by J.S. can occur during consensual sex or rebut her conclusions using a defense expert. *Blanton*, 2018-Ohio-1275, at ¶ 66. Although the research on which Blanton relied was not in the trial record, the Fourth District noted that counsel's decisions regarding cross-examination and whether to call an expert witness generally fall within the realm of trial strategy and speculated that Blanton was not prejudiced by his counsel's alleged failure. *Id*. at ¶ 67-69.

**{¶ 66}** In the postconviction proceedings, both the trial court and the court of appeals concluded that because Blanton had raised this claim in his direct appeal, it was barred by res judicata. 2020-Ohio-7018 at ¶ 27. Neither court addressed the fact that Blanton's ineffective-assistance claim is based on evidence outside the trial record. Because the research on which Blanton relies was not contained in the trial record, the merits of this claim could not have been fully considered in his direct appeal. Indeed, when a claim of ineffective assistance is based on counsel's failure to present evidence during the trial-court proceedings, and that evidence is not proffered or otherwise contained in the trial record, it is almost invariably the type of claim that cannot be meaningfully adjudicated in a direct appeal.

**{¶ 67}** We therefore conclude that Blanton's claim regarding his counsel's failure to present evidence concerning the lack of correlation between female genital injuries and nonconsensual sex was based on evidence—Dr. Mushkat's affidavit and the attached medical journal article—that was not included in the trial

record and could not be meaningfully reviewed in his direct appeal. *See Smith*, 17 Ohio St.3d at 101, 477 N.E.2d 1128, fn. 1 (if the evidence in the trial record is insufficient to establish an ineffective-assistance claim, the denial of that claim in a direct appeal does not prevent a petitioner from supporting the claim with outside-the-record evidence in a postconviction proceeding). Thus, the court of appeals erred in concluding that Blanton could not raise the issue in his postconviction-relief petition because he had already raised it in his direct appeal.

**{¶ 68}** Nonetheless, we still must address the prejudice question. That is, would the evidence proffered in the petition, "if believed," establish a "violation [that] was prejudicial" to Blanton? *Cole*, 2 Ohio St.3d at 114, 443 N.E.2d 169. We conclude that it would not.

**{¶ 69}** The article that Blanton submitted with Dr. Mushkat's affidavit asserted that as of 2012, there was no consensus regarding whether evidence of female genital trauma could support a finding of forced sexual conduct. *See* Anderson & Sheridan, 38 J. Emergency Nursing at 521. But Blanton did not provide any expert opinion or conclusions about J.S.'s injuries. Dr. Mushkat opined only that Blanton "did not have the benefit of a child abuse expert to discuss whether the findings in regard to the examination of J.S. were consistent with a consensual sexual event or a sexual assault; or whether any opinion could even be rendered on this question without making credibility assessments of the history given by the patient and by the accused." We can only speculate as to what such an expert's conclusions would have been. Blanton has thus failed to set forth facts sufficient to demonstrate that his counsel performed deficiently or that there is a reasonable probability that the result of the trial would have been different if the jury had heard this evidence.

### 3. Counsel's decisions regarding calling Blanton's girlfriend as a witness

**{¶ 70}** During the defense's case-in-chief, Blanton's counsel called Blanton's high school girlfriend to the stand. Before she could testify, the

prosecutor asked to approach the bench. At sidebar, the prosecutor noted that another criminal case was pending against Blanton that was based on allegations relating to the girlfriend. The parties debated the extent to which the state could question her about topics that might incriminate Blanton in the other case or prejudice him in the rape case. Ultimately, the trial court allowed Blanton's counsel to confer with him outside the presence of the jury about whether to proceed with his girlfriend's testimony. When the jury returned, Blanton's counsel announced that the witness was being withdrawn. The jury subsequently learned through Blanton's own testimony that the withdrawn witness was his girlfriend.

**{¶ 71}** Blanton argued in his direct appeal that his counsel provided ineffective assistance by announcing to the jury that he intended to call the girlfriend as a witness and then not following through. This, he said, gave the jury the false impression that his girlfriend's testimony would have been damaging to him. The Fourth District rejected his claim, concluding that there was no evidence in the record regarding what the jurors thought of the defense's decision not to call the witness and that any claim of prejudice was therefore speculative. *Blanton*, 2018-Ohio-1275 at ¶ 72-73. Because the issue had been raised in Blanton's direct appeal, the trial court denied his postconviction claim on res judicata grounds, and the court of appeals affirmed, 2020-Ohio-7018 at ¶ 29.

**{¶ 72}** Blanton's postconviction-relief petition provides some information that was not in the trial record. It explains the nature of the charges in the other case—that Blanton had allegedly possessed a nude photo of his girlfriend taken when she was a minor. And his affidavit reports that the defense had expected Blanton's girlfriend to testify that his demeanor did not change between the time that he left her earlier that day and when he returned following his encounter with J.S. They also expected her to say that she would have felt hurt if Blanton had confessed to cheating on her.

**{¶ 73}** Blanton argues that the state would not have been able to question

the girlfriend about the allegations in the other case under the Ohio Rules of Evidence and therefore it was not reasonable for his counsel to fail to call the girlfriend to the stand. The state maintains that Blanton's claim that his counsel acted unreasonably in deciding not to call his girlfriend is barred by res judicata. In debating whether the decision not to call the girlfriend to testify was reasonable, both the state and Blanton rely on information about the other case involving the girlfriend that was not included in the trial record in this case. We therefore conclude that the court of appeals erred in holding that the claim had been fully adjudicated in the direct appeal.

{¶ 74} Nonetheless, we still must consider whether the evidence, if believed, establishes a substantive ground for relief. *See Cole*, 2 Ohio St.3d at 114, 443 N.E.2d 169. We begin by noting that Blanton's petition is not supported by any averments of the girlfriend. Rather, he attested to what he believes his girlfriend's testimony would have been. But Blanton lacks personal knowledge of the facts that he expected his girlfriend to relate: her perception of his demeanor after his encounter with J.S. and her assessment of how she would have reacted had he told her that he had had consensual sex with J.S.

{¶ 75} Even assuming that Blanton's predictions about the girlfriend's testimony are correct, his claim still fails to present a substantive ground for relief. While the state may not have been able to question the girlfriend about the specific allegations in the other case, it likely could have explored her relationship with Blanton generally as a means of establishing her bias or motivation to lie. *See* Evid.R. 616(A). Moreover, the testimony that Blanton suggests she would have offered does not substantially support his postconviction claim. The fact that his girlfriend did not observe a change in his demeanor when he returned to her soon after having sex with another girl does nothing to establish that the sex was consensual. At best, it illustrates that Blanton was good at hiding his indiscretions from her. And any acknowledgment by his girlfriend that she would have been hurt

by his having sex with another girl likewise adds little to his ineffective-assistance claim.

{¶ 76} Decisions as to whether to call a witness to testify are typically matters of trial strategy that courts are "reluctant to disturb," though counsel's decision "must be grounded in some strategy that advances the client's interests." *Eze v. Senkowski*, 321 F.3d 110, 129 (2d Cir.2003). Here, counsel could reasonably have concluded that the marginal benefits of the girlfriend's testimony did not outweigh the risk of the jury's hearing potentially damaging evidence. We therefore affirm the court of appeals' judgment on this claim.

### 4. Counsel's failure to file an affidavit of disqualification

{¶ 77} Prior to trial, Blanton's attorneys filed a motion asking the trial-court judge to recuse himself from the case. The basis for the motion was that J.S.'s father was the superintendent of the school district where the judge's wife worked. The court held a hearing on the motion, during which counsel presented no additional evidence. At the hearing, counsel explained, "[W]e are not suggesting that your relationship with your wife * * * or your relationship with this case in any way has been prejudicial towards our client. * * * If we felt that there was a prejudice then it would be our duty to sign an affidavit to take the case to the Supreme Court and do it that way." Counsel said they had debated whether to raise the matter at all and that they had determined that filing an affidavit of disqualification would be "totally inappropriate." The judge noted that the school district is one of the largest employers in Adams County, and he explained that he was relying on the hearing to learn whether anything inappropriate had been said by or to his wife regarding the case. Having been informed of no such interference, the judge declined to recuse himself.

{¶ 78} On direct appeal, Blanton did not assign any error to counsel's handling of the recusal issue. *See Blanton*, 2018-Ohio-1275. But in his postconviction-relief petition, he asserts that his attorneys provided ineffective

assistance by failing to further pursue the judge's removal from the case by filing an affidavit of disqualification in this court. *See* R.C. 2701.03. The allegations of bias contained in the petition are concentrated on the judge's wife's employment in the school district for which J.S.'s father was the superintendent. Blanton's petition doesn't set forth any allegations about the judge's wife's employment that were not included in the trial record. Thus, we agree with both of the courts below that the claim could have been addressed on direct appeal and is therefore barred by res judicata. *See* 2020-Ohio-7018 at ¶ 25.

### 5. Counsel's failure to move for a change of venue

{¶ 79} Blanton asserts in his petition that his trial counsel should have moved for a change of venue due to "the low population of [Adams County] and the high degree of media attention" to the case. He points to the voir dire proceedings, which he says demonstrate that a number of the jurors had some connection to the families or agencies involved in the case. But, again, this voir dire evidence was part of the trial record. The trial court and the court of appeals properly concluded that the claim could have been adjudicated on direct appeal. *See* 2020-Ohio-7018 at ¶ 31. Thus, it is barred by res judicata.

### 6. Cumulative error

{¶ 80} Finally, Blanton's postconviction-relief petition in the rape case asserts that his counsel performed deficiently in multiple respects, such that even if counsel's errors were harmless when considered separately, he was nevertheless prejudiced by the cumulative effect of the errors. But before this court may find that a defendant was prejudiced by "cumulative error," it must first conclude that multiple errors were committed. *State v. Madrigal*, 87 Ohio St.3d 378, 398, 721 N.E.2d 52 (2000). Because Blanton has not established any constitutional violations, his cumulative-error claim fails. *See State v. Were*, 1st Dist. Hamilton No. C-080697, 2009-Ohio-4494, ¶ 88, citing *Madrigal* at 398.

*B. Postconviction proceedings in the jail case*

**{¶ 81}** Blanton's postconviction-relief petition in the jail case raises five claims. First, he contends that the state violated his due-process rights by destroying video evidence from the jail in bad faith that was either materially exculpatory or potentially useful to his defense. Specifically, he alleges that the video would have shown that Lunsford was not unconscious when Blanton was punching him. He also raises three ineffective-assistance claims. He alleges that his attorneys were deficient in failing to ensure his presence at a hearing on a motion to dismiss the indictment on the ground that the state had destroyed the video evidence. He says that his decision not to testify at his trial was based on bad legal advice regarding the state's ability to impeach him with evidence of his prior convictions. And he maintains that his attorneys should have filed either a motion asking the trial-court judge to recuse himself from the jail case or an affidavit of disqualification in this court. Finally, Blanton argues that he was prejudiced by the cumulative effect of the alleged errors.

**{¶ 82}** The trial court once again rejected Blanton's claims primarily on the basis of res judicata, and the Fourth District affirmed. 2020-Ohio-7018.

### 1. Claims relating to the state's failure to preserve video footage

**{¶ 83}** At Blanton's trial, the state relied on video footage showing the attack on Lunsford taken from the catwalk outside the jail cell. As previously noted, the video shows Blanton punching Lunsford repeatedly in the head as Lunsford lay on the cell's floor. Blanton did this after watching Michael and McKee beat and stomp on Lunsford. Lunsford testified that he lost consciousness during a portion of the assault. And in the state's closing argument, the prosecutor described the video as portraying Blanton's punching an "unconscious" Lunsford.

**{¶ 84}** Prior to trial, Blanton's counsel filed a motion to dismiss the charges in the jail case, claiming that Blanton's due-process rights were violated by the state's failure to retain additional video footage. A due-process violation occurs

26

when the government fails to preserve materially exculpatory evidence or when it destroys evidence in bad faith that is potentially useful to the defense. *See State v. Geeslin*, 116 Ohio St.3d 252, 2007-Ohio-5239, 878 N.E.2d 1, ¶ 9, citing *Arizona v. Youngblood*, 488 U.S. 51, 57-58 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). Blanton's motion focused on footage from the day of and day after the assault, a period during which Lunsford claimed he had hidden when corrections officers approached the cell. The defense contended that the video would have shown Lunsford's actions and thus was either inculpatory or exculpatory. The gist of the defense's argument was that Lieutenant Micah Poe, the jail's administrator, had acted in bad faith by selectively retaining only video footage that was helpful to the state's case while allowing additional footage from the time of the alleged crimes to be recorded over.

{¶ 85} The state responded that Lieutenant Poe had presented only the felonious-assault charge to the prosecutor's office and that he had therefore preserved only the portion of the video showing the assault. According to the state, it was not until the prosecutor's office had conducted its own investigation that it decided to add the kidnapping charge, and by that time, the footage had been recorded over. The trial court concluded that the defense had not met its burden of demonstrating that the video was exculpatory or destroyed in bad faith, and it denied the motion to dismiss.

{¶ 86} Blanton was not present at the hearing on the motion to dismiss, but he addressed the video evidence during his sentencing hearing. Blanton maintained that Lunsford was never unconscious during the assault. He said that Lieutenant Poe showed him footage of the assault taken from the other end of the catwalk, which depicted Lunsford moving his arms to protect himself from Blanton's punches, and that Lunsford's movements were not visible in the footage used during trial that was taken from another angle. Lieutenant Poe testified during Blanton's trial that the camera on the other end of the catwalk did not capture footage of the inside of the cell; Blanton alleged that this was a lie aimed at covering

up the evidence that Lunsford had remained conscious.

{¶ 87} Blanton raised a due-process claim based on the destroyed video footage in his direct appeal. *Blanton*, 2018-Ohio-1278, 110 N.E.3d 1, at ¶ 86. The court of appeals paid particular attention to the allegations that Blanton made during his sentencing hearing, noting that he had alleged "personal knowledge of the exculpatory nature of the discarded video footage and bad faith on the part of the investigator in failing to preserve it." *Id.* at ¶ 97. But the court of appeals concluded that even "taking [Blanton's] statements at sentencing as truthful," the video footage he described—showing that Lunsford continued to protect himself against Blanton's punches—was not exculpatory. *Id*. at ¶ 98. And it held that even assuming the video would have been potentially useful to Blanton's defense, there had been no showing that it was destroyed in bad faith. *Id*. at ¶ 99.

{¶ 88} Blanton's postconviction-relief claim relies primarily on the same factual allegations. He argues that the footage taken from the other end of the catwalk depicted a "very conscious Lunsford using both arms to defend himself from [Blanton's] punches," but that the footage used at trial "did not capture Lunsford's defensive arm movements because a table was blocking the view of most of his body." His petition presents additional information relating to his allegation that the video was destroyed in bad faith, however. Specifically, Blanton avers that when Lieutenant Poe showed him the footage of the fight from both camera angles, "[Poe] told me he had enough charges against me to ensure I would never go home."

{¶ 89} Blanton's petition asserts two claims based on these facts: that his due-process rights were violated by the state's failure to preserve the video and that his attorneys provided ineffective assistance by failing to ensure his presence at the hearing on the motion to dismiss. We address each claim in turn.

### a. Application of res judicata to an alleged due-process violation

{¶ 90} In reviewing Blanton's postconviction claim relating to the video

evidence, the trial court noted that in Blanton's direct appeal, the Fourth District credited his allegations about the content of the missing video but nonetheless concluded that the evidence he described—namely, footage of Lunsford fending off his punches—was not exculpatory. The trial court therefore concluded that Blanton's due-process claim was barred by res judicata. The Fourth District affirmed on the same grounds. 2020-Ohio-7018 at ¶ 37.

{¶ 91} As we have already explained, the general rule of res judicata is that "a final judgment of conviction bars the convicted defendant from raising and litigating in any proceeding, except an appeal from that judgment, any [claim] that was raised or could have been raised by the defendant at the trial which resulted in that judgment of conviction or on an appeal from that judgment." *Perry*, 10 Ohio St.2d at 180, 226 N.E.2d 104. We have recognized an exception to that rule in the limited context of postconviction ineffective-assistance-of-counsel claims involving evidence outside the record. *See Cole*, 2 Ohio St.3d 112, 443 N.E.2d 169, at syllabus.

{¶ 92} Blanton asks us to expand this exception to allow a postconviction petitioner to proceed on a due-process claim based on the state's failure to preserve evidence, even when the alleged violation was known to the defense at the time of trial. In essence, he asks us to reach the merits of a claim that could have been—but was not—fully developed during the trial proceedings. This ignores our rationale for adopting the limited exception to the application of res judicata for postconviction ineffective-assistance claims: when a defendant must rely on his attorney to develop the record or use evidence, and the attorney fails to do so, there is no other way for the defendant to establish the attorney's deficient performance except by presenting evidence outside the trial record. *See State v. Hester*, 45 Ohio St.2d 71, 76, 341 N.E.2d 304 (1976). In other words, most claims of ineffective assistance cannot be developed by the defendant during the trial proceedings.

{¶ 93} Blanton offers no basis to expand this exception to include

constitutional claims other than ineffective assistance of counsel, and we can see none. Indeed, doing so would upend decades of caselaw to the contrary. It is true, however, that res judicata precludes only those due-process claims that could have been developed during the trial proceedings. Thus, when a petition alleges a due-process violation based on the state's wrongful concealment of evidence beneficial to the defense, and that violation was not discovered until after trial, res judicata is no bar to the claim. *See Perry* at 179, citing *McMullen*, 3 Ohio St.2d 160, 209 N.E.2d 449.

{¶ 94} But here, during the trial-court proceedings, the defense was aware of the state's failure to preserve the video evidence and knew of the information on which Blanton now relies in postconviction. Because the basis for Blanton's due-process claim was known to him at the time of trial and could have been fully litigated at that time, the claim is barred by res judicata.

### b. *Blanton's absence from the hearing on the motion to dismiss*

{¶ 95} Perhaps anticipating our holding on his due-process claim, Blanton also contends that his counsel was ineffective for not requesting that he be present for the hearing on the motion to dismiss. Blanton asserts that if he had attended the hearing, he would have told his attorneys about the footage allegedly showing that Lunsford had been conscious throughout the attack, emphasized the need for his counsel to call Lieutenant Poe to the stand, and testified on his own behalf.

{¶ 96} The trial court found that these claims, which had been raised in Blanton's direct appeal, were barred by res judicata. The court of appeals affirmed the trial court's judgment on different grounds. *See* 2020-Ohio-7018 at ¶ 42-43. The court of appeals noted that in rendering its decision, the trial court performed "an in-depth review of the petition, the briefs submitted, the affidavits attached, and the appellate decisions." *Id.* at ¶ 43. The court of appeals explained that Blanton's affidavit could "fairly be considered 'self-serving' " and concluded that the trial court "did not abuse its discretion by failing to give [his] affidavit credence." *Id.*

{¶ 97} Blanton takes aim at these last statements. He says the trial court made no such credibility determination and that the court of appeals improperly made its own credibility determination. He therefore asks us to reaffirm our decision in *State v. Calhoun*, 86 Ohio St.3d 279, 284-285, 714 N.E.2d 905 (1999), and hold that appellate courts are not permitted to make de novo determinations regarding the credibility of an affidavit supporting a postconviction-relief petition.

{¶ 98} We agree that appellate courts may not decide the credibility of an affidavit supporting a postconviction petition in the first instance. We explained in *Calhoun* that when reviewing a postconviction-relief petition, a trial court may judge the credibility of a supporting affidavit and discard claims that are purely frivolous. *Id*. at 292. But sworn affidavits "should not lightly be deemed false." *Id*. at 284. And when a trial court "discounts the credibility of sworn affidavits," it should "include an explanation of its basis for doing so." *Id*. at 285.

{¶ 99} Still, this is largely beside the point. To be entitled to a hearing, Blanton needed to set forth evidence outside the trial record that, if believed, established that his trial counsel was ineffective. The focus of Blanton's claim about the missing video was that, according to Blanton, the video would have shown that Lunsford never lost consciousness when Blanton was attacking him as he lay on the ground. And his claim about his absence from the hearing on the motion to dismiss is premised on his assertion that if he had been present, he would have demonstrated that the destroyed video would have shown that Lunsford was conscious during the attack and that the video was destroyed in bad faith.

{¶ 100} But that is all a non sequitur. Blanton's allegations about the content of the video do not establish that it was materially exculpatory. To convict Blanton of felonious assault, the state was required to prove that he knowingly caused serious physical harm to Lunsford. *See* R.C. 2903.11(A)(1). Blanton watched as other inmates dragged Lunsford to the floor and began kicking him in the head. Once Lunsford was incapacitated, Blanton joined in and punched him

about 15 times in the head. The attackers then dispersed for a few moments. But when Lunsford tried to stand up, Blanton dealt him a few more blows to the head. He then pinned Lunsford up against the wall, beating him until he collapsed. The group continued to attack Lunsford until he stopped moving. A doctor determined that the assault caused Lunsford to sustain a concussion. As the court of appeals concluded in Blanton's direct appeal, whether Lunsford was moving during the entirety of Blanton's assault has no bearing on whether Blanton knowingly caused him serious physical harm. *See Blanton*, 2018-Ohio-1278, 110 N.E.3d 1, at ¶ 98.

{¶ 101} The court of appeals also determined in Blanton's direct appeal that even if the footage of the assault from a different angle would have been "potentially useful" to his defense, Blanton had made no showing that it was destroyed in bad faith. *Id.* at ¶ 99. Blanton's petition sets forth additional allegations on the issue of bad faith based on evidence outside the trial record. Blanton alleges that Lieutenant Poe laughed at him when he was convicted of the charges in the rape case and told him that he "would have 30 years to think about what [he] did." And Blanton says that following the assault on Lunsford, Poe claimed to have "enough charges against [Blanton] to ensure that [he] would never go home."

{¶ 102} The problem with Blanton's bad-faith argument is that his allegations—even if believed—don't established bad faith. At most, the allegations could establish that Poe had some animosity toward Blanton. Poe's animosity doesn't equate to a showing that he deliberately destroyed evidence. Thus, even if we credit Blanton's outside-the-record evidence about what he would have added to the hearing on the motion to dismiss, Blanton is still not entitled to relief. Blanton has failed to set forth facts that, if believed, show that the result of the hearing on the motion to dismiss would have been different had he been present. *See Cole*, 2 Ohio St.3d at 114, 443 N.E.2d 169.

### 2. Legal advice regarding impeachment by prior conviction

**{¶ 103}** Blanton further asserts that his trial counsel gave him incorrect legal advice that influenced his decision not to testify in his own defense in the jail case. He avers that his attorneys advised him against testifying, telling him that the prosecutor would have the right to "impeach [him]" with his recent convictions in the rape case. He maintains that this advice was incomplete, in that the state does not have an absolute right to impeach a defendant with his prior convictions. Rather, under Evid.R. 609(A)(2), evidence that the accused has been convicted of crime is admissible only if the trial court "determines that the probative value of the evidence outweighs the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Blanton maintains that had he known this, he would have sought a pretrial ruling on the admissibility of his convictions from the rape case before deciding whether to testify in the jail case.

**{¶ 104}** The trial court rejected this claim on two grounds. It concluded that the claim was barred by res judicata because it could have been raised on direct appeal and that the allegations failed to establish a substantive claim for relief. We disagree with the trial court's first determination and are unable to consider the second.

**{¶ 105}** In determining that res judicata applied, the trial court reasoned that the fact "[t]hat the specific reasons for the decision not to testify were not in the record did not prevent [Blanton] from arguing [in his direct appeal] that counsel was ineffective for failing to have him testify." The court of appeals agreed, concluding that Blanton's claim "could have been included in the direct appeal." 2020-Ohio-7018 at ¶ 46. We disagree. Blanton's ineffective-assistance claim alleges that he was given bad legal advice regarding his decision whether to testify. That information is not in the trial record, and the claim could not have been adjudicated in his direct appeal. This claim was therefore not subject to dismissal on res judicata grounds.

{¶ 106} Nevertheless, both the trial court and the court of appeals alternatively determined that Blanton's ineffective-assistance claim failed on the merits. *Id.* at ¶ 47. The court of appeals noted that Blanton's affidavit stated: "If called to the witness stand, I would have told the jury that Gary Lunsford was fully conscious and deflecting my punches with his arms." *Id.* The court of appeals concluded, "[Blanton] fails to see how the statement 'deflecting my punches with his arms' would not be helpful to him." *Id.* Thus, the court of appeals determined that even if Blanton's allegations were taken as true, he failed to show that he was prejudiced by his counsel's performance. *See id.* Because Blanton has not challenged that determination, that portion of the court of appeals' judgment is not before us. *See Estate of Ridley*, 102 Ohio St.3d 230, 2004-Ohio-2629, 809 N.E.2d 2, at ¶ 27, citing *Timken Mercy Med. Ctr.*, 61 Ohio St.3d at 87, 572 N.E.2d 673. We affirm the judgment of the court of appeals rejecting this claim.

### 3. Counsel's failure to file a motion to recuse or an affidavit of disqualification

{¶ 107} Blanton next asserts that his counsel provided ineffective assistance by failing to move for the trial judge's recusal or to file an affidavit in this court to have him disqualified in the jail case. The lower courts concluded, as they did with the similar allegation in the rape case, that this claim was barred by res judicata. *See* 2020-Ohio-7018 at ¶ 52-54.

{¶ 108} But the analysis for this claim is not the same in both cases. As we explained earlier, Blanton's claim regarding his attorneys' failure to pursue an affidavit of disqualification in the rape case was barred by res judicata because the factual allegations of bias were contained in the trial record, through the motion for recusal and the subsequent hearing on that motion. But Blanton's counsel did not file a motion to recuse in the jail case. As a result, the facts on which Blanton now relies are not contained in the trial record. Because the claim relies on information outside the trial record, it is not barred by res judicata.

**{¶ 109}** Still, we conclude that the lower courts reached the correct judgment. The allegations of bias on which Blanton relies in his petition in the jail case stem entirely from the rape case: Blanton again highlights the fact that the judge's wife was an employee of the school district for which J.S.'s father served as superintendent. He also vaguely alleges that during the rape trial, the judge "made comments, some of which were not recorded, and rulings" that reinforced Blanton's belief that the judge was biased against him. His petition does not elaborate on the nature of the comments or rulings in the rape case. Nor does he allege any conduct by the trial judge during the jail case that suggests any improper bias. Indeed, Blanton contends only that his counsel should have filed a motion to recuse to prevent the judge's alleged bias in the rape case from "carrying over" to the jail case. But the fact that a judge has presided over a previous case involving the same defendant does not by itself establish bias in the current case. We therefore conclude that Blanton has failed to allege facts sufficient to establish that he was denied effective assistance of counsel in this respect, and we affirm the judgment of the court of appeals on that basis.

### 4. Cumulative error

**{¶ 110}** Blanton again contends that he has been prejudiced by the combined effect of his counsel's errors in the jail case, such that he has been denied the right to effective assistance of counsel. Because Blanton has not established a substantive right to relief on any of his claims, this claim, too, must fail.

### V. CONCLUSION

**{¶ 111}** We adhere to our precedent regarding the application of res judicata to postconviction claims alleging a denial of the constitutional right to effective assistance of counsel. Such claims are not procedurally barred if they cannot be meaningfully reviewed without resorting to evidence outside the trial record. In this case, however, all of Blanton's claims are either barred by res judicata or fail to set forth a substantive claim for relief. We therefore affirm the judgment of the

Fourth District Court of Appeals upholding the trial court's dismissals of his petitions for postconviction relief.

Judgment affirmed.

KENNEDY, FISCHER, DONNELLY, and BRUNNER, JJ., concur.

O'CONNOR, C.J., and STEWART, J., concur in judgment only.

————————

C. David Kelley, Adams County Prosecuting Attorney, and Mark R. Weaver and Ryan M. Stubenrauch, Assistant Prosecuting Attorneys, for appellee.

Dennis C. Belli, for appellant.

Joseph T. Deters, Hamilton County Prosecuting Attorney, and Ronald W. Springman Jr., Chief Assistant Prosecuting Attorney, urging affirmance for amicus curiae Hamilton County Prosecutor's Office.

Morrow, Gordon & Byrd, Ltd., and Phillip Demarest, urging affirmance for amici curiae Ohio Law and Liberty Foundation and Rape, Abuse & Incest National Network.

Timothy Young, Ohio Public Defender, and Timothy B. Hackett, Max Hersch, and Elise Grifka Wander, Assistant Public Defenders; Russell S. Bensing; and Erika Cunliffe, Assistant Cuyahoga County Public Defender, urging reversal for amici curiae Office of the Ohio Public Defender, Ohio Association of Criminal Defense Lawyers, and Office of the Cuyahoga County Public Defender.

————————