[Cite as *State v. Baker*, 2024-Ohio-906.]

COURT OF APPEALS
MUSKINGUM COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  | JUDGES: |
|---|---|---|
| STATE OF OHIO | : | Hon. Patricia A. Delaney, P.J. |
|  | : | Hon. W. Scott Gwin, J. |
| Plaintiff-Appellee | : | Hon. Craig R. Baldwin, J. |
|  | : |  |
| -vs- | : |  |
|  | : | Case No. CT2023-0019 |
| TRISTANEY BAKER | : |  |
|  | : |  |
| Defendant-Appellant | : | OPINION |

CHARACTER OF PROCEEDING: Appeal from the Muskingum County Court
of Common Pleas, Case No. CR2021-0762

JUDGMENT: Affirmed

DATE OF JUDGMENT ENTRY: March 11, 2024

APPEARANCES:

For Plaintiff-Appellee

RON WELCH
Prosecuting Attorney
BY: JOHN C, DEVER
Assistant Prosecuting Attorney
27 North 5th Street, Suite 201
Zanesville, OH 43701

For Defendant-Appellant

PETER GALYARDT
Assistant Public Defender
250 East Broad Street, Suite 1400
Columbus, OH 43215

*Gwin, J.,*

{¶1}　Defendant-appellant Tristaney Baker ["Baker"] appeals the March 8, 2023 decision of the Muskingum County Court of Common Pleas overruling her petition for postconviction relief after an evidentiary hearing.

*Facts and Procedural History*

{¶2}　On May 13, 2021, Baker was indicted on the following counts:

Count 1: Aggravated Murder (firearm specification), unclassified felony, R.C. 2903.01(A); R.C. 2941.145;

Count 2: Aggravated Murder (firearm specification), unclassified felony, R.C. 2903.01(B); R.C. 2941.145;

Count 3: Aggravated Burglary (firearm specification), felony of the first degree, R.C. 2911.11(A)(2);

Count 4: Tampering with Evidence, felony of the third degree, R.C. 2921.12(A)(1);

Count 5: Possession of Criminal Tools, felony of the fifth degree, R.C. 2923.24(A).

{¶3}　On May 17, 2021, Baker entered a plea of guilty to all counts. The trial court ordered a pre-sentence investigation and set the matter for a sentencing hearing.

{¶4}　On June 28, 2021, a sentencing hearing was held. The trial court merged Counts 1 and 2 for purposes of sentencing and sentenced Baker as follows:

Count 1: Mandatory prison term of life in prison without the possibility of parole

Specification: Mandatory prison term of three years

Count 3: Prison term of eleven years

Specification: Mandatory prison term of three years

Count 4: Prison term of thirty-six months

Count 5: Prison term of twelve months

{¶5}    The judge ordered the terms of incarceration to be served concurrently with one another, the firearm specifications shall both be served mandatory consecutive to each other and count one for an aggregate mandatory sentence of life in prison without the possibility of parole plus six years.

{¶6}    Baker filed an appeal raising in her First Assignment of Error that she was denied the effective assistance of trial counsel. *State v. Baker,* 5th Dist. Muskingum No. CT2021-0041, 2022-Ohio-1853. [*Baker I*] at ¶28. Specifically, Baker argued that trial counsel's failure to request a competency evaluation constituted ineffective assistance of counsel. Id. at ¶33. Baker further argued that trial counsel was ineffective for failing to support his mitigation arguments with a psychological report or evaluation. Id. at ¶42.

{¶7}    Concerning Baker's first argument, this Court held,

[T]he alleged indicia of incompetence that counsel for Appellant repeatedly cites would have been insufficient to overcome the legal presumption of competence, because such does not suggest that Appellant was incapable of understanding the nature and objective of the proceedings against her or of assisting in her own defense.

Accordingly, the record does not show a reasonable likelihood that the trial court would have found Appellant incompetent to stand trial.

{¶8}    Concerning Baker's second contention, this Court held,

Upon review, we find that trial counsel in this matter presented extensive mitigating evidence focused on Appellant's dysfunctional family and upbringing, alleged abuse, and traumatic events in her life. Further, defense counsel successfully negotiated a sentence that did not include the death penalty.

*Baker, I* at ¶ 43. In her Second Assignment of Error, Baker challenged the constitutionality of her sentence. We overruled both of Baker's assignments of error and affirmed the trial judge's decision.

**{¶9}** On September 7, 2022, Baker filed a Motion for Leave to file Petition to Vacate and set aside Convictions and Sentences Under Seal. [Docket Entry No. 33].

**{¶10}** On September 16, 2022, the state filed its memorandum in opposition to Baker's petition. [Docket Entry No. 34].

**{¶11}** On September 19, 2022, Baker filed a Motion for Leave to File Amended Petition to Vacate and Set Aside Convictions and Sentence Pursuant to R.C. 2953.21 and Civ.R. 15(A) and (C), Under Seal. [Docket Entry No. 35].

**{¶12}** On September 22, 2022, Baker filed a reply to the state's opposition to her petition. [Docket Entry No. 36].

**{¶13}** On September 29, 2022, Baker filed a Motion for Leave to File Amended Petition to Vacate and Set Aside Convictions and Sentence Pursuant to R.C. 2953.21 [Docket Entry No. 36] and a Motion for Leave to File Amended Petition to Vacate and Set Aside Convictions and Sentence Pursuant to R.C. 2953.21 and Civ.R. 15(A) and (C), Under Seal. [Docket Entry No. 37].

{¶14} On October 12, 2022, the trial judge filed a Judgment Entry setting the matter for hearing on December 12, 2022. [Docket Entry No. 40].

{¶15} The trial judge conducted an evidentiary hearing on December 12, 2022. The only witness to testify was Dr. Bob Stinson.

{¶16} Dr. Stinson met with Baker at her prison for two hours and forty-five minutes to conduct an evaluation. PCR T., Dec. 12, 2022 at 9. Dr. Stinson administered the Advanced Childhood Experience Questionnaire ("ACE') and the Trauma Symptom Inventory, Second Edition. ("TSI-2"). Id. at 20. Dr. Stinson diagnosed Baker with schizoaffective disorder, which is a combination of schizophrenia and bipolar disorder. Id. at 38-39. Baker was further diagnosed with post-traumatic stress disorder ("PTSD") and attention deficit disorder ("ADD"). Id. at 39. Further, the prison system diagnosed Baker with schizoaffective disorder. Id. at 44. Meaning, that in addition to her bipolar disorder Baker was experiencing symptoms of psychosis, such as auditory hallucinations, which were occurring before the crimes to which she pled guilty. Id. at 44. Dr. Stinson further opined that because of Baker's age, her cognitive abilities have not fully developed. Id. at 52.

{¶17} Dr. Stinson testified that Baker is responsible for her behavior including her actions in the underlying aggravated murder. Id. at 43; 55. However, Baker's history of trauma and unfortunate upbringing impacted her behavior in the underlying crime. Id. at 97-98.

{¶18} Dr. Stinson recommended that Baker receive trauma treatment, medication management and development of emotional regulation skills. Id. at 57-60. Dr. Stinson further recommended Baker receive drug and alcohol treatment. Id. at 66. With these

treatments, Dr. Stinson testified that he would expect Baker's tendency for violence to decrease, especially as she grows older. Id. at 68; 70. In response to a question from the trial judge, Dr. Stinson admitted he could not say that without treatment, Baker's aging would be enough to decrease her tendency to violence. Id. at 129. Dr. Stinson could not predict how long a course of treatment Baker would need to see substantive results. Id. He would need to reevaluate Baker in twenty years to determine her progress. Id.

**{¶19}** Dr. Stinson's report was accepted into evidence as Defendant's Exhibit B. PCR T. Dec. 12, 2022 at 72.

**{¶20}** In a three-page Judgment Entry filed March 8, 2022, the trial judge overruled Baker's petition, stating,

> The issues presented by the defendant have already been reviewed by the Appellate Court and therefore res judicata applies.
>
> This Court finds that the evidence provided by the defendant does not provide enough additional evidence to show that the defense counsel was constitutionally ineffective.
>
> Issues raised by the State's proposed findings of facts and conclusions of law are incorporated herein and accepted by this Court.

*Assignments of Error*

**{¶21}** Baker raises three Assignments of Error,

**{¶22}** "I. THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT DENIED TRISTANEY BAKER'S POSTCONVICTION PETITION AFTER THE HEARING. FIFTH AND FOURTEENTH AMENDMENTS, UNITED STATES CONSTITUTION; ARTICLE I, SECTIONS 10 AND 16.

**{¶23}** "II. THE TRIAL COURT VIOLATED TRISTANEY BAKER'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL THROUGH JUDICIAL BIAS. FIFTH AND FOURTEENTH AMENDMENTS, UNITED STATES CONSTITUTION; ARTICLE I, SECTIONS 10 AND 16, OHIO CONSTITUTION.

**{¶24}** "III. THE TRIAL COURT VIOLATED TRISTANEY BAKER'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL WHEN IT DENIED HER A MEANINGFUL OPPORTUNITY TO BE HEARD. FIFTH AND FOURTEENTH AMENDMENTS, UNITED STATES CONSTITUTION.

I.

**{¶25}** In her First Assignment of Error, Baker argues the trial judge abused his discretion by denying her petition for postconviction relief.

### Standard of Review

**{¶26}** We review a decision to grant or deny a petition for postconviction relief under an abuse-of-discretion standard. *State v. Hatton*, 169 Ohio St.3d 446, 2022-Ohio-3991, 205 N.E.3d 513, ¶ 38, *citing State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 51-52, 58.

*Postconviction relief*

**{¶27}** A postconviction proceeding is a collateral civil attack on a criminal conviction. *State v. Calhoun*, 86 Ohio St.3d 279, 281, 714 N.E.2d 905 (1999); *State v. Phillips*, 9th Dist. No. 20692, 2002-Ohio-823. R.C. 2953.21(A) states, in part, as follows: "(1) Any person who has been convicted of a criminal offense or adjudicated a delinquent child and who claims that there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution

of the United States may file a petition in the court that imposed sentence, stating the grounds for relief relied upon, and asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief".

**{¶28}** In the case at bar, Baker cannot appeal the imposition of a sentence of life imprisonment without the possibility of parole based upon a conviction for aggravated murder. R.C. 2953.08(D)(3)[1]. Therefore, Baker, in a petition for postconviction relief must rely upon evidence outside of the trial court record to demonstrate a violation of a constitutional right so as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States. *State v. Calhoun*, 86 Ohio St.3d 279, 714 N.E.2d 905(1999). In the case at bar, Baker alleges that her trial counsel rendered ineffective assistance during the sentencing hearing because trial counsel did not present an expert witness or a report from an expert witness in mitigation of her sentence.

*Findings of fact by the trial judge*

**{¶29}** The trial court must make findings of fact and conclusions of law when denying a petition for postconviction relief. *State v. Mapson*, 1 Ohio St.3d 217, 219, 438 N.E.2d 910 (1982).

**{¶30}** Civ.R. 52 states that it is within the trial court's "discretion" to "require any or all of the parties to submit proposed findings of fact and conclusions of law." The trial court in the instant case ordered both parties to submit proposed findings of fact and conclusions of law.

**{¶31}** In *Anderson v. City of Bessemer,* the United States Supreme Court held,

---

[1] We note, however, R.C. 2953.08(D)(3) does not preclude an appellate court's review of a constitutional challenge to a sentence for aggravated murder or murder. *State v. Patrick,* 164 Ohio St.3d 952, 2020-Ohio-6803, 172 N.E.3d 952, ¶ 22.

Nonetheless, our previous discussions of the subject suggest that even when the trial judge adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous. *United States v. Marine Bancorporation,* [418 U.S. 602], at 615, n. 13, 94 S.Ct., at 2866, n. 13, [41 L.Ed.2d 978 (1974)]; *United States v. El Paso Natural Gas Co.,* [376 U.S. 651] at 656-657, 84 S.Ct., at 1047-1048, [12 L.Ed.2d 12(1964)].

470 U.S. 564, 572, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). The findings of the court "must stand or fall depending on whether they are supported by evidence." *United States v. Crescent Amusement Co.,* 323 U.S. 173, 185, 65 S.Ct. 254, 260, 89 L.Ed. 160 (1944).

**{¶32}** In Ohio, a trial court may adopt a party's findings of fact so long as they are accurate. *See State v. Combs*, 100 Ohio App.3d 90, 652 N.E.2d 205 (1st Dist. 1994), *citing Adkins v. Adkins*, 43 Ohio App.3d 95, 539 N.E.2d 686 (4th Dist. 1988). In *Adkins*, the court stated that a court may adopt a party's "'proposed findings * * * verbatim,'" "but that "'[b]efore adopting proposed findings * * * the trial judge has a duty to read the document thoroughly, and ensure that it is completely accurate in fact * * *.'" "Id. at 98, 539 N.E.2d 686, *quoting Paxton v. McGranahan*, 8th Dist. Cuyahoga No. 49645 (Oct. 31, 1985); *State v. Rose*, 4th Dist. Highland No. 06 CA 5, 2006-Ohio-5292, ¶ 45; *State v. White,* 5th Dist. Ashland No. 2006-COA-014, 2007-Ohio-3423, ¶49.

*Application of res judicata in postconviction-relief proceedings raising ineffective*

*assistance of counsel claims*

**{¶33}** With respect to post-conviction petitions asserting grounds for relief based on ineffective assistance, res judicata does not bar a postconviction ineffective-

assistance-of-counsel claim when either (1) the petitioner had the same attorney at trial and on appeal or (2) he must rely on evidence outside the trial record to establish his claim for relief. * * * The converse is that when the petitioner had a new attorney on appeal and the claim could have been litigated based on the trial record, res judicata applies and the postconviction claim is barred." *State v. Blanton,* 171 Ohio St.3d 19, 2022-Ohio-3985, 215 N.E.3d 467, ¶ 2, *citing State v. Cole*, 2 Ohio St.3d 112, 113-114, 443 N.E.2d 169 (1982). Merely providing evidence outside the record is not sufficient to entitle a petitioner to a hearing. Rather, to secure a hearing, a petitioner "'must proffer evidence which, if believed, would establish not only that his trial counsel had substantially violated at least one of a defense attorney's essential duties to his client but also that said violation was prejudicial to the [petitioner].'" Id. at ¶ 31, *quoting Cole* at 114, 443 N.E.2d 169; *State v. Johnson*, 12th Dist. Warren No. CA2022-09-063, 2023-Ohio-879, ¶21. However, there is no requirement that to overcome a res judicata bar, the evidence on which such a claim is based must have been unknown or unavailable to the defense at trial. *State v. Blanton*, 171 Ohio St.3d 19, 2022-Ohio-3985, 215 N.E.3d 467, ¶60.

{¶34} In the case at bar, Baker did not have the same attorney in the trial court and on appeal. The trial judge held an evidentiary hearing on Baker's petition. Baker presented evidence outside the trial court record in the form of testimony from an expert witness and the expert witness' report during the evidentiary hearing. This evidence was not contained in the original trial court record.

{¶35} To the extent that the trial court accepted the state's erroneous conclusion of law that Baker's claims were barred by res judicata, his decision is contrary to law and therefore an abuse of discretion.

*Ineffective assistance of counsel standard in postconviction relief*

**{¶36}** Nearly fifty years ago, the Ohio Supreme Court set forth the standard to determine ineffective assistance of counsel claims under Section 10, and Section 16 of Article I, Ohio Constitution and the Sixth Amendment to the United States Constitution in *State v. Hester*, 45 Ohio St.2d 71, 341 N.E.2d 304(1976), and thereafter slightly revised in *State v. Lytle*, 48 Ohio St.2d 391, 358 N.E.2d 623 (1976), *vacated in part on other grounds*, 438 U.S. 910, 98 S.Ct. 3135, 57 L.Ed.2d 1154(1978).

**{¶37}** "In *State v. Hester, supra*, at page 79, 341 N.E.2d 304, this Court held 'the test to be whether the accused, under all the circumstances, * * * had a fair trial and substantial justice was done.'" *State v. Jackson,* 64 Ohio St.2d 107, 110, 341 N.E.2d 306(1980).

**{¶38}** In *State v. Lytle,* the Court held "[w]hen presenting an allegation of ineffective assistance of trial counsel to a reviewing court, an appellant must initially show a substantial violation of an essential duty by that counsel." 48 Ohio St.2d 391, 396–397, 358 N.E.2d 623, 627. The Court further noted, "[w]hen considering an allegation of ineffective assistance of counsel, a two-step process is usually employed. First, there must be a determination as to whether there has been a substantial violation of any of defense counsel's essential duties to his client. Next, and analytically separate from the question of whether the defendant's Sixth Amendment rights were violated, there must be a determination as to whether the defense was prejudiced by counsel's ineffectiveness." 48 Ohio St.2d 396-397, 358 N.E.2d 632. *Accord, State v. Bradley,* 42 Ohio St.3d 136, 141-142, 538 N.E.2d 373 (1989). To establish prejudice, a defendant must show "that there is a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different." Id. at 694, 104 S.Ct. 2052.

*Andtus v. Texas*, 590 U.S. ——, 140 S.Ct. 1875, 1881, 207 L.Ed.2d 335 (June 15, 2020)[2].

**{¶39}** The Ohio Supreme Court applies this standard to capital and noncapital *offenses* alike. *See, State v. Bunch,* 171 Ohio St.3d 775, 2022-Ohio-4723, 220 N.E.3d 773, ¶1, ¶26; *State v. Blanton,* 171 Ohio St.3d 19, 2022-Ohio-3985, 215 N.E.3d 417, ¶22; 45; *State v. Davis,* 159 Ohio St.3d 31, 2020-Ohio-309, 146 N.E.3d 500, ¶2; 6; 10; *State v. Nicholas,* 66 Ohio St.3d 431, 436, 613 N.E.2d 225(1993); *State v. Cooperrider,* 4 Ohio St.3d 226, 228, 448 N.E.2d 452 (1983).

**{¶40}** This two-part test also applies to capital, as well as noncapital, *sentencing* proceedings. *Lafler v. Cooper*, 566 U.S. 156, 165, 132 S.Ct. 1376, 182 L.Ed.2d 398, 182 L.Ed. 398 (2012):

> The precedents also establish that there exists a right to counsel during sentencing in *both noncapital*, *see Glover v. United States*, 531 U.S. 198, 203–204, 121 S.Ct. 696, 148 L.Ed.2d 604 (2001); *Mempa v. Rhay*, 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967), *and capital cases*, see *Wiggins v. Smith*, 539 U.S. 510, 538, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). Even though sentencing does not concern the defendant's guilt or innocence, ineffective assistance of counsel during a sentencing hearing can result in *Strickland* prejudice because "any amount of [additional] jail

---

[2] We note parenthetically that in the context of noncapital felony sentencing, the test would better be expressed as whether a reasonable judge would have found a particular set of mitigating circumstances persuasive enough to have imposed a less punitive sentence. *See*, Gohara, Miriam, *Grace Notes: A Case for Making Mitigation the Heart of Noncapital Sentencing* (January 15, 2013). American Journal of Criminal Law, Vol. 41, No. 41, 2013, at 79.

time has Sixth Amendment significance." *Glover, supra*, at 203, 121 S.Ct. 696. (Emphasis added).

**{¶41}** More importantly, the Ohio Supreme Court has applied this two-part test when reviewing a claim of ineffective assistance of trial counsel in a petition for postconviction relief based upon trial counsel's failure to present expert evidence to mitigate the trial court's imposition of a sentence of life without the possibility of parole in a non-capital sentencing proceeding. *State v. Weaver,* 171 Ohio St.3d 429, 2022-Ohio-4371, 218 N.E.3d 806, ¶48.

**{¶42}** To the extent that the trial judge accepted the state's erroneous conclusion of law that *Strickland* does not apply to noncapital felony sentencing cases, his decision is contrary to law and therefore an abuse of discretion.

*An attorney is not required to hire a mitigation expert in every noncapital felony case*

**{¶43}** In *State v. Weaver*, Weaver went into a bathroom in the sorority house and, without assistance, delivered a child. *State v. Weaver,* 5th Dist. Muskingum No. CT2016-0033, 2017-Ohio-4374, ¶3. [*Weaver, I*]. The baby was delivered into the toilet; Weaver, while bleeding profusely, delivered the placenta, cut the umbilical cord, and pulled the baby out of the toilet. She then placed the placenta and the baby in a small pail that was in the bathroom. She thereupon left the bathroom and rested on a couch.

**{¶44}** At some point, Weaver returned to the bathroom with a garbage bag and placed the baby, the placenta, paper towels, and some of her clothing inside the bag. She then carried the bag to the side door of the sorority house and placed it outside, next to a garbage can. After this, she went back inside the house to lie down. Id. at ¶ 4.

{¶45}  Later that day, two sorority members found the bag lying next to the house. They tore a hole in the bag and thereupon contacted university officials. Id. at ¶5.

{¶46}  An autopsy was subsequently performed on the baby. The results showed that she had been born alive, but had died of asphyxiation. Tr. at 347, 350, 382. Id. at ¶7.

{¶47}  Weaver was indicted on one count of aggravated murder, one count of gross abuse of a corpse, and two counts of tampering with evidence. Id. at ¶8.

{¶48}  The case proceeded to a jury trial. Weaver was found guilty on all counts.

{¶49}  Trial counsel mentioned "neonaticide" only in passing in his argument to the court regarding sentence. The trial court-imposed life in prison without parole for the offense of aggravated murder. In support of its sentencing decision, the trial court concluded Weaver was not remorseful, she had committed "the worst form of the offense," and she had caused emotional hardship to her sorority sisters. Sentencing Tr. at 10–16. Id. at ¶10.

{¶50}  Weaver appealed, we overruled her assignments of error and affirmed the judgment of the trial court. State v. Weaver, 5th Dist. Muskingum, 2017-Ohio-4374, 93 N.E.3d 178 The Ohio Supreme Court declined to review the decision. 151 Ohio St.3d 1510, 2018-Ohio-365, 90 N.E.3d 950.

{¶51}  Thereafter, Weaver filed a petition for postconviction relief. In her petition, Weaver alleged counsel was ineffective for failing to present evidence concerning "neonaticide" in mitigation of sentence. State v. Weaver, 5th Dist. Muskingum No. CT2017-0075, 2018-Ohio-2509, 114 N.E.3d 766. [Weaver, II]. She attached to her petition an affidavit of Dr. Clara Lewis, and an article by Michelle Oberman discussing "neonaticide," including sentencing data. After conducting an evidentiary hearing as

ordered by this Court in *Weaver, II,* the trial court overruled the petition. We affirmed the trial judge's decision. *State v. Weaver,* 5th Dist. Muskingum No. CT2019-0034, 2021-Ohio-1025. [*Weaver, III*].

{¶52} The Ohio Supreme Court accepted Weaver's discretionary appeal. *See*, 164 Ohio St.3d 1409, 2021-Ohio-2795, 172 N.E.3d 181. [*Weaver, IV*]. The Ohio Supreme Court noted, "[t]he only issue before the trial court at the evidentiary hearing was whether Weaver's trial counsel was ineffective for failing to present information concerning neonaticide as a mitigating factor. Weaver contends that the trial court denied her petition for postconviction relief without any objective consideration of her ineffective-assistance claim." *Weaver, IV* at ¶ 30.

{¶53} The Ohio Supreme Court found that the expert testimony and evidence presented by the witnesses during the hearing on Weaver's postconviction relief petition explained the potentially misunderstood psychological conditions of pregnancy negation and neonaticide. Id. at ¶ 13. The Court found if counsel would have presented that evidence during sentencing, the trial judge would have learned that there was a specific personality and demographic profile of women who committed neonaticide and the specific details that allegedly placed defendant into that profile, the evidence could have framed Weaver's actions not as premeditated, but those of desperation and panic from an immature and isolated young woman, and the trial judge would have been able to weigh that evidence against the state's arguments at sentencing, including that defendant lacked remorse and that there were no mitigation grounds. The Supreme Court further found that the trial judge arbitrarily rejected the expert testimony, inappropriately questioned the state's witnesses and, "failed to cite the long-established test from

*Strickland*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674[3], by providing a cursory and unreasonable analysis as to why Weaver's counsel was effective." Id. at ¶46-48. The Court found that the trial judge's extreme bias against the expert mitigation evidence and Weaver herself as evidenced in the trial court record necessitated that a different judge be appointed on remand to conduct a new sentencing hearing. Id. at 59-62.

**{¶54}** The rationale the Court utilized in *Weaver* illustrates that it does not stand for a free-standing proposition that trial counsel has a duty to provide expert testimony, affidavits or reports in every noncapital felony sentencing case to avoid being labeled as ineffective. The Court found that trial counsel "allegedly performed deficiently for failing to explain neonaticide and its applicability to Weaver's case. Specifically, defense counsel failed to (1) define the term "neonaticide" for the trial court, (2) explain the social and cultural causes of neonaticide and provide a personality and demographic profile of women who commit this act and the pattern of behaviors that are typical leading up to the crime, and (3) describe how Weaver and her actions fit into this profile and pattern, thereby contextualizing her actions as those of extreme panic rather than premeditation. Counsel did nothing more than mention the term 'neonaticide.'" *Weaver, IV* at ¶ 50.

**{¶55}** In analyzing the prejudice prong of the *Strickland* analysis, the Court determined that the evidence provides a *compelling narrative* that could have framed Weaver's actions not as premeditated but as those of desperation and panic from an immature and isolated young woman. Further, the experts in Weaver provided articles detailing several cases involving neonaticide in which the defendants received significantly lighter sentences than Weaver. 34 Am.Crim.L.Rev. at 91-98 (providing

---

[3] This affirmative mandate by the Ohio Supreme Court directly repudiates the state's suggestion that we are free to disregard *Strickland* in noncapital felony sentencing cases.

neonaticide statistics regarding the varying sentences imposed for women convicted of similar crimes who fit within the personality profile of those who commit neonaticide, including one woman who was convicted of second-degree murder and sentenced to probation with counseling). *Id.* at 58 emphasis added.

*Baker's expert evidence is not of the same compelling nature as in Weaver's*

*case*

**{¶56}** Unlike the expert in *Weaver*, trial counsel did more that make a perfunctory statement requesting mitigation. In the case at bar, during Baker's sentencing hearing, her attorney informed the trial judge,

> Your Honor, I think that right now we're looking at a sentencing range that at the minimum would be 26 to life with the 2 firearm specifications, and then at the maximum would be life without the possibility of parole. That's what Miss Baker is currently facing based on the charge that she pled to, and so I'm not suggesting in any way that she would deserve the minimum. I know the co-defendant got the minimum, but he wasn't the primary actor here. She was, and she knows that she doesn't deserve the minimum sentence here. In fact, she knows that she's going to prison for the rest of her life and it's just a question of whether she'll have any hope of parole.
>
> And the State is arguing for the maximum sentence, and I believe that the maximum sentence would not be appropriate. I believe that some number of years to life would be the appropriate sentence, and I'm not going to give any opinion on how many years that would be.

I don't believe that there's anything that mitigates this behavior. As far as factually, what Mr. Litle stated is all correct.

She did plan this out, she did go in and kill the victim on purpose in a horrible way, and she admitted to all of that. She pled to all of that. So, we're not really here to talk about the facts or to dispute any of the facts.

I do think there is a lot that mitigates in this case and in Miss Baker's sentencing and I do want to just talk about it. I think that there's a story that isn't being told here. It was a little bit hinted at, but there's a story here that needs to be told before the Court imposes sentencing so I do just want to talk about Miss Baker's personal attributes and her background.

Her biological parents are, as discussed in the presentence investigation, Tim and Amy. Tim left when she was one week old. She was mostly raised by her biological mother who's in the courtroom today.

When she was 11 years old, she was removed from the home, and that began her time in foster care. She was abused at a young age by her mother's boyfriend. That was between 3 and 6 years old. And by abused, I mean physical abuse, emotional abuse, and sexual abuse.

Anybody who does this job has probably some familiarity with child psychology and knows that when a young child is traumatized by physical and sexual abuse that often stunts their maturity and they stop maturing anymore past that point.

And I've spent more hours with Tristaney Baker than anybody in this courtroom except her family, and I can tell you that she is very immature

and she wishes she wasn't that way. She throws temper tantrums. She lashes out at anybody who makes her mad or says something that she doesn't like. She hasn't chosen to be that way, she's been made that way, and this type of trauma that she suffered all through her childhood has never been addressed so the person that we have here isn't a surprise, shouldn't be a surprise to society. She was called horrible names. She was screamed at. She was put down, constantly degraded by him. She was hit in ways other than spanking, hit violently, and then there was sexual abuse which involved both him touching her and her being forced to perform sexual acts on him.

And as Mr. Litle said, Licking County did not do anything to get her justice and to get her the counseling that she needed and so she grew up at a very young age with a ton of anger. And her and her mom had issues, and she eventually had to be removed after her behavior was so violent and so angry that her mom couldn't control her.

So, she goes to her first foster home, spends about six months there. Is returned to her mom for three weeks.

Goes to a second foster home where all of the children were removed because the foster dad pulled a gun on the foster mom and shot at her, which was, again, traumatic for her.

Went to a third foster home, and this is where she met the people that she eventually considered her adoptive parents even though they didn't

adopt her, but they were parents that showed her a lot of care, didn't abuse her, and really tried to help her. She went to a fourth foster home on respite.

All during this time she was in 7 to 8 different schools just from 6th grade on, so there was no stability in her life. Nobody really wanted her in their home. She had to go through a 60-day program because no foster home would even accept placement of her because of her behavioral issues but, again, she finally was placed with the people that she considered to be her adoptive parents.

She was in a different foster home for 6th and 7th grade and was physically abused in that home.

Back to her mom for a short time in 9th grade.

Back to foster care after becoming sexually active. Ended up in a group home in Knox County. And finally, she turns 18 and she's placed into the Bridges program. And the Bridges program is a program for kids who have aged out of the juvenile system and now are being thrown out into society to be adults and don't know how to be adults, and so Bridges helps them with how to get a job, how to manage money, and things like that, because no adult in her life ever taught her how to be a functioning member of society.

When she was 19, she was placed with a job in Zanesville at Spectrum and she worked at a call center. She was making $21 an hour. She had her own apartment. She was going to classes at Zane State. It

was, I think, the high point of her life. She was feeling good about herself. For once she had her own thing. She had a job. She was on the right path.

And in April of 2020, unfortunately, she met the victim and her friend Ann at a Speedway in Zanesville. They offered to help her with her car that was overheating.

As the PSI reflects, Miss Baker was a heavy drinker at that time. She would get blackout drunk every weekend. And so, she invited them to her house to drink with her-to her apartment- and they came over and drank and they got her to use crack. It's the first time she'd ever used any drugs besides alcohol.

And so ten days later, after being awake from ten days of crack and meth use, they gave her some Fentanyl and put her down after stealing her life savings and her iPhone, and that was it. No more job, an eviction notice on her apartment door, sick from drugs, and that's when she began to be prostituted.

The victim in this case brought the first john to her, said she's a virgin, took $400, gave her a hundred of it, and that began her life in prostitution.

The victim then introduced her to Pat Downs who was her pimp.

And I should note that not only has Tristaney gone through all of this, but my understanding is that the victim also went through this type of abuse and exploitation and drug use, and it's a tragedy for everybody involved. And the victim, I'm told, suffered more physical abuse from Pat Downs than Tristaney did.

She was raped during this time. She was locked in a room for weeks at a time and given drugs, and people were sent back to have sex with her. She ended up contracting gonorrhea, chlamydia, and herpes which she'll now have for the rest of her life. Pat was violent to her, more so to [the victim].

So here she is. She's lost her job. She's been evicted. She's sick. She's got epilepsy from the crack use. She's been hospitalized twice at Genesis for sepsis. She's lost her pride.

She's lost everything. Her reputation has been ruined. This was all before she committed murder. She'd been dehumanized by everybody in her life. Nobody helped her. And when she finally was in a good place, people took it away from her. She has a lot of anger and a lot of rage in her life and she's always going to. I don't think she's going to get treatment for any of this while she's in prison.

This case is a tragedy on every level. Her whole life, every day of it has been a tragedy. [The victim]'s life was a tragedy.

I think there are things that mitigate she's not just an evil person. She is the way that she was built to be by the people that were supposed to be taking care of her and raising her and it's sickening and I don't believe that demonizing her further and acting like she's just all bad all the time does any good for anybody.

When she asked me on the phone if she could get a Justice for [the victim] shirt, that wasn't meant to be cruel or mocking anybody. It's because

she believes that [the victim] isn't going to get justice because even though she's going to go to prison for the rest of her life and Devin is going to go for the rest of his life, the other people that victimized [the victim] and have been involved in all of this aren't going to be served justice, and that was her point, is that she's taking her punishment, she's taking her responsibility, and she believes that other people also should be held accountable.

Your Honor, I believe that some number of years to life is the appropriate sentence. I don't believe that her lack of prior felony record, which was zero, no prior felony record-even though there have been allegations made by the State, she's never been charged or convicted with these things.

I don't think that she's the worst version of an offender.

All aggravated murders are horrible. That's why they're the worst offense in the State of Ohio. But when you compare her to other people who commit aggravated murder, I think there's a lot to mitigate for her and I don't think that the maximum sentence would be appropriate. · Thank you.

Sent. T., June 28, 2021 at 8-16.

{¶57} The state pointed out to the trial judge the deliberateness, premeditation and callousness with which Baker acted in murdering the victim,

When we are dealing with Miss Baker, she has demonstrated through her conduct when committing this offense and her conduct

throughout this process that we are dealing with someone who is an extremely bad human being in addition to her bad conduct.

I'm going to start with the nature of her offense, what she did in this case. She became upset with her victim for no apparent good reason, demanding that her on-again, off-again boyfriend kick out Jayla from his apartment. As part of her rage, she came down and busted a bunch of windows outside of the apartment, and she went back with her other on-again, off-again boyfriend to Columbus.

The next day, after sending enraged voice mails demanding that Jayla be kicked out of the house, she came up with a plan. She threatened. She then planned out what she was going to do. She discussed it with her co-defendant, arranged for him to obtain a firearm and provide it to her, came down here to Zanesville, and over a period of hours stalked her victim, showing up down here, wiping the bullets down for fingerprints, getting out of the car, creeping around the side of the building waiting for the coast to be clear for her to perpetrate her act.

And then when the time was right, when she saw Pat Downs drive away from the location to go get his lottery ticket, snuck up to the apartment, opened the door, and executed Jayla.

And when I say she executed her, she shot her in the hip. Then she continued shooting until Jayla was on the ground, and then she went up and executed her. She shot her in the face.     That's just about as extreme and premeditated as a murder can be and for no reason at all.

We look to her past. She has prior offenses of violence which were pending. She took a Molotov cocktail at one point when she was angry at Devin's mother and threw it, after threatening to do so, threw it at an occupied structure. They found it later. It didn't break or go off, but that's the only reason that a house was not burned down by her in her rage. These are very extreme situations.

And in a case where potentially there can be a death penalty, there's a death investigation --penalty investigation that's conducted concurrently with the criminal investigation. That was done here in this case. Two detectives were assigned the task of finding out what mitigation information might exist as to Miss Baker.

* * *

Her behavior in the jail. This is a person who calculatedly murdered someone in cold blood, gets put in the jail, and finds a person with mental health issues and entertains herself by adulterating food and leaving it out in her already lockdown cell so that this person with mental health issues who can't help herself will then eat the food that's been secreted around.

The Court is aware that after her plea hearing in this case Miss Baker thought that it would be appropriate to make some jail calls. In those jail calls she is laughing and bragging about how she asked her attorney where she could get a Justice for Jayla cheap T-shirt like she saw the victim's family wearing in court. She stated that she would do it 10,000 times again,

she just wouldn't get caught. That is the degree to which she has learned anything so far through this process, laughing the entire time.

You see through her presentence investigation that she has gone on to fabricate a narrative that implicates the person who called 911 and turned her in for the shooting. This Court is aware of Pat Downs, as is the prosecutor's office and the police department, and this case was investigated and none of the things that she says when she's trying to draw other people into the penumbra of her crimes has any truth to it. So now she's just trying to spread destruction through lies to other individuals.

Sent. T., June 28, 2021 at 4-7.

{¶58} We do not find that trial counsel's act in forgoing the hiring and presentation of a mitigation expert under the particular facts of this case amounted to a substantial violation of an essential duty by that counsel. Although Dr. Stinson's testimony and report is more detailed and nuanced, the information that he presented to the trial court is fundamentally the same as the oral evidence provided by trial counsel to the trial judge during the sentencing hearing, and the evidence contained in the pre-sentence investigation report. The main difference is that Dr. Stinson diagnosed Baker with several mental illnesses. Dr. Stinson's testimony and report present the same evidence of Baker's dysfunctional family and upbringing, alleged abuse, and traumatic events in her life. Dr. Stinson agrees that Baker was responsible for her conduct and capable of distinguishing right from wrong. He presented nothing of a compelling nature concerning a little understood psychological condition that would serve to mitigate Baker's actions not as premeditated, but as those of desperation and panic. He urged the trial judge to consider,

as did trial counsel at sentencing, Baker's age, that she could benefit from treatment and possibly at some time in the future become less violent and less of a threat.

{¶59} As the Ohio Supreme Court has noted,

> Additional mitigating evidence that is "'merely cumulative' of that already presented" does not undermine the results of sentencing. *Broom v. Mitchell*, 441 F.3d 392, 410 (6th Cir. 2006), *quoting Clark*, 425 F.3d at 286. Instead, "the new evidence * * * must differ in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing." *Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005); *see Tibbetts v. Bradshaw,* 633 F.3d 436, 444 (6th Cir. 2011).

*State v. Herring,* 142 Ohio St.3d 165, 2014-Ohio-5228, 28 N.E.3d 1217, ¶117. "The decision to forgo the presentation of additional mitigating evidence does not itself constitute proof of ineffective assistance of counsel." *State v. Keith*, 79 Ohio St.3d 514, 536, 684 N.E.2d 47(1997). *Accord, State v. Were,* 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶237.

{¶60} However, even if we were to find that trial counsel was under a duty to hire a mitigation expert in this noncapital felony sentencing case, we would find that Baker has failed to demonstrate prejudice because the trial judge did consider the evidence during the proceedings on her petition for postrelease control and was not persuaded to change his sentence.

> *The record indicates the trial judge considered all the evidence in mitigation and in aggravation.*

**{¶61}** During the hearing on Baker's postrelease control petition, the trial judge asked Dr. Stinson whether he could be sure that Baker will receive the treatment she needs in prison. PCR T. Dec. 12, 2022 at 128. Dr. Stinson replied that he could not be sure Baker would receive the treatment she needs while incarcerated. Id. The trial judge then asked if without treatment, just growing older, would that be enough for her? Id. at 129. Dr. Stinson replied that he could not predict whether Baker's natural neuromaturation will be sufficient in 20, 25, 30, 35, or 40 years. Id. Dr. Stinson testified he would need to look at her 20 years from now and see. Id. Further, in his judgment entry, the trial judge found "that the evidence provided by the defendant does not provide enough additional evidence to show that the defense counsel was constitutionally ineffective." Clearly, these questions and statements illustrate that the trial judge listened to what Dr. Stinson was saying and was considering his testimony before he reached a conclusion on Baker's petition for postconviction relief.

**{¶62}** "[T]he Constitution does not require a State to ascribe any specific weight to particular factors, either in aggravation or mitigation, to be considered by the sentencer." *Harris v. Alabama*, 513 U.S. 504, 512, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995). Rather, in *State v. Jackson*, the court explained,

> We have long held that in imposing sentence, the assessment of and weight given to mitigating evidence are within the trial court's discretion. *State v. Lott* (1990), 51 Ohio St.3d 160, 171, 555 N.E.2d 293. "The fact that mitigation evidence is admissible 'does not automatically mean that it must be given any weight.' However, the weight to be given the evidence is a matter for the trial judge. *State v. Steffen* (1987), 31 Ohio St.3d 111, 3, 509

N.E.2d 383, paragraph two of the syllabus." *State v. Mitts* (1998), 81 Ohio

St.3d 223, 235, 690 N.E.2d 522.

107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶106.

**{¶63}** "Serious mental illness" does not automatically mandate parole

consideration. R.C. 2929.025 defines "serious mental illness" as a person diagnosed with

one or more of the following conditions,

       (i) Schizophrenia;

       (ii) Schizoaffective disorder;

       (iii) Bipolar disorder;

       (iv) Delusional disorder.

**{¶64}** When a sentence of death is being sought, the defendant is required to raise

the issue of "serious mental illness" prior to trial. The trial court is then directed to order

an evaluation of the person and conduct an evidentiary hearing on the issue. If the court

at the pretrial hearing finds that the defendant has proved, by a preponderance of the

evidence, that the person has been diagnosed with a serious mental illness as defined

and that the condition or conditions diagnosed significantly impaired the person's capacity

at the time of the alleged offense in a manner as described in the statute, the court shall

issue a finding that the person is *ineligible for a sentence of death due to serious mental

illness.* R.C. 2925.03(E)(2). R.C. 2929.03(E)(2) mandates that if the defendant is found

to be ineligible for a sentence of death due to serious mental illness, and was convicted

of aggravated murder and one or more specifications of an aggravating circumstance

listed in division (A) of section 2929.04 of the Revised Code, the court or panel of three

judges *shall not impose a sentence of death* on the offender. Instead, the court or panel *shall sentence the offender to life imprisonment without parole.* Emphasis added.

**{¶65}** In the case of a noncapital felony sentence of life without parole, the legislature could have, but did not, mandate a parole eligible sentence for an adult offender due to the offender's "serious mental illness."

**{¶66}** Expert witnesses only provide information to assist a trial judge to fashion an appropriate sentence. *Weaver* only requires a trial judge to *consider* the mitigation evidence. However, the weight to be given any particular mitigating factor remains within the trial judge's discretion. *See*, *State v. Weaver,* 171 Ohio St.3d 429, ¶58 ("we express no view on whether this evidence indeed should result in a reduction of Weaver's sentence…"); *State v. Toles*, 166 Ohio St.3d 397, 2021-Ohio-3531, 186 N.E.3d 784, ¶10 ("R.C. 2953.08, as amended, precludes second-guessing a sentence imposed by the trial court based on its weighing of the considerations in R.C. 2929.11 and 2929.12."); *State v. Jones*, 163 Ohio St.3d 242, 2020-Ohio-6729, 169 N.E.3d 649, ¶39 ("R.C. 2953.08(G)(2)(b) does not provide a basis for an appellate court to modify or vacate a sentence based on its view that the sentence is not supported by the record under R.C. 2929.11 and 2929.12.").

**{¶67}** Therefore, at the time the trial judge sentenced Baker for her crimes any "serious mental illness" that Baker suffered at the time she committed the offenses to which she pled guilty and any potential for her rehabilitation are factors that a trial judge may consider when considering both the purposes and principles of felony sentencing set forth in R.C. 2929.11 and the seriousness and recidivism factors set forth in R.C. 2929.12. Although a court imposing a felony sentence must consider the purposes of felony

sentencing under R.C. 2929.11 and the sentencing factors under R.C. 2929.12, "neither R.C. 2929.11 nor 2929.12 requires [the] court to make any specific factual findings on the record." *State v. Jones*, 163 Ohio St.3d 242, 2020-Ohio-6729, 169 N.E.3d 649. at ¶ 20, *citing State v. Wilson*, 129 Ohio St.3d 214, 2011-Ohio-2669, 951 N.E.2d 381, ¶ 31, and *State v. Arnett*, 88 Ohio St.3d 208, 215, 724 N.E.2d 793 (2000). There is no requirement that a trial court must make a finding on the record that a defendant is not amenable to rehabilitation before the court can sentence an *adult* offender to life without the possibility of parole. *State v. Jenkins,* 5th Dist. Muskingum No. CT2021-0001, 2021-Ohio-4100, ¶ 46. Accordingly, the only question before us is whether the trial judge considered Dr. Stinson's testimony and report before he overruled Baker's petition for postconviction relief. If he did, we cannot change the result.

**{¶68}** The record in this case shows that the trial judge considered all the mitigation evidence, including the evidence presented during sentencing, the presentence investigation report, and the hearing on Baker's petition for postconviction relief concerning her mental illnesses and the possibility of rehabilitation before he overruled Baker's petition for postconviction relief.

**{¶69}** Accordingly, even if counsel's failure to present a mitigation expert at sentencing reflected deficient performance, which we do not find under the specific facts of this case, Baker has failed to establish prejudice under *Strickland*.

**{¶70}** Baker's First Assignment of Error is overruled.

II.

**{¶71}** In her Second Assignment of Error, Baker argues, "The court's legal errors, unreasonable merits decision, blanket adoption of the prosecution's proposed

findings of fact and conclusions of law, and arbitrary disregard of Dr. Stinson's report and testimony described in the first assignment of error, *supra*-which is fully incorporated as if rewritten here--demonstrate both a closed mind with fixed anticipatory judgment, and deep-seated antagonism that precluded fair judgment." [Appellant's brief at 27].

*Judicial bias*

{¶72} "A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955); *accord Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876, 129 S.Ct. 2252, 173 L.Ed.2d 1208 (2009). For purposes of the due-process guarantee, fairness "requires the absence of actual bias in the trial of cases" and "a system of law [that] endeavor[s] to prevent even the probability of unfairness." *Murchison,* 349 U.S. at 136. Thus, a "trial before a biased judge is fundamentally unfair and denies a defendant due process of law." *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, 34, *citing Rose v. Clark*, 478 U.S. 570, 577, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986); *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980) ("the Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases"). In fact, "[t]he presence of a biased judge on the bench is * * a paradigmatic example of structural constitutional error, which if shown requires reversal without resort to harmless-error analysis." *State v. Sanders*, 92 Ohio St.3d 245, 278, 750 N.E.2d 90 (2001), *citing Arizona v. Fulminante*, 499 U.S. 279, 309-310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). Structural error typically "is grounds for automatic reversal," so long as an objection has been raised in the trial court. *State v. West*, 168 Ohio St.3d 605, 2022-Ohio-1556, 200

N.E.3d 1048, ¶ 2[4]. "Defendants should bring any potential structural errors to the trial court's attention so they may be corrected; they should not wait to raise the claim on appeal with the thought that prejudice will be presumed if a structural error is found." *State v. Bond*, 170 Ohio St.3d 316, 2022-Ohio-4150, 212 N.E.3d 880, ¶34 *citing State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 23.

**{¶73}** "The inquiry [for judicial bias] is an objective one. The court asks not whether the judge is actually, subjectively biased, but whether the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'" *Caperton v. A.T. Massey Coal Co., Inc.,* 556 U.S. 868, 881, 129 S.Ct. 2252, 173 L.Ed.2d 128 (2009). Moreover, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion," but instead, "[a]lmost invariably are proper grounds for appeal, not recusal." *Liteky v. United States,* 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 174 (1994). Likewise, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." Id. at 555. *See, State v. Morrow,* 5th Dist. Muskingum No. CT2021-0053,2022-Ohio-1089, ¶43.

**{¶74}** Judicial bias is demonstrated by "a hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by the law and [the] facts." *State v. Jackson*, 149

---

[4] *West* established that a plain-error analysis is necessary when a defendant seeks reversal based on an error to which the defendant did not object at trial. But *West* left unresolved the extent to which the existence of *structural error* is relevant to that analysis. *State v. Bond*, 170 Ohio St.3d 316, 2022-Ohio-4150, 212 N.E.3d 880, ¶ 10 (emphasis added).

Ohio St.3d 55, 2016-Ohio-5488, ¶ 33, *quoting State ex rel. Pratt v. Weygandt*, 164 Ohio St. 463 (1956), paragraph four of the syllabus. "A judge is presumed to follow the law and not to be biased, and the appearance of bias or prejudice must be compelling to overcome these presumptions." *In re Disqualification of George*, 100 Ohio St.3d 1241, 2003-Ohio-5489, ¶ 5. Moreover, a party that seeks to establish bias bears the burden of overcoming that presumption. *Coley v. Bagley*, 706 F.3d 741, 751 (6th Cir. 2013).

**Issue for Appellate Review:** *Whether Baker has cited compelling evidence that the trial judge was biased or whether there is an unconstitutional "potential for bias" that seriously affected the fairness, integrity, or public reputation of the sentencing hearing*

{¶75} Baker does not cite to any statement made by the trial judge during the sentencing hearing or the hearing on her petition for postconviction relief to demonstrate bias. Mere evidence of distain for the defendant is not enough,

> The judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person. But the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes (as in a bench trial) necessary to completion of the judge's task. As Judge Jerome Frank pithily put it: "Impartiality is not gullibility. Disinterestedness does not mean child-like innocence. If the judge did not form judgments of the actors in those court-

house dramas called trials, he could never render decisions." *In re J.P. Linahan, Inc.*, 138 F.2d 650, 654 (C.A.2 1943).

*Liteky v. United States,* 510 U.S. at 550-551, 114 S.Ct. 1147, 127 L.Ed.2d 174 (1994).

{¶76} As we have found in our disposition of Baker's First Assignment of Error, the trial judge did listen to and consider Dr. Stinson's testimony. We do not find evidence in the record which would overcome the strong presumption that the trial judge was free of bias or prejudice against Baker or that establishes the trial judge's conduct denied Baker her right to due process.

{¶77} We find that Baker has failed to cite compelling evidence in the record that the trial judge was biased or that there was an unconstitutional "potential for bias" that seriously affected the fairness, integrity, or public reputation of the sentencing hearing or the hearing on her petition for postconviction relief.

{¶78} Baker's Second Assignment of Error is overruled.

III.

{¶79} In her Third Assignment of Error, Baker argues "Ms. Baker fully incorporates the first and second assignments of error as if rewritten here and asserts that she was not provided a meaningful opportunity to be heard throughout her postconviction litigation and specifically at the hearing due to the trial court's bias, legal errors, unreasonable merits decision, blanket adoption of the prosecution's proposed findings of fact and conclusions of law, and arbitrary disregard of Dr. Stinson's report and testimony. See First and Second Assignments of Error, supra." [Appellant's brief at 28-29].

*Meaningful opportunity to be heard*

**{¶80}** The procedural protections afforded by the Due Process Clause of the Fourteenth Amendment require that parties to an action be given reasonable notice and an opportunity to be heard before a competent tribunal, "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), *quoting Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965); *Luff v. State*, 117 Ohio St. 102, 157 N.E. 388 (1927), paragraph four of the syllabus.

**{¶81}** "Because there is no federal constitutional right to a post-conviction review process, Ohio's post-conviction proceedings afford only a narrow remedy strictly defined by statute and granting no rights to a petitioner beyond those spelled out in R.C. 2953.21. *State v. Campbell,* 10th Dist. Franklin App. No. 03AP-147, 2003-Ohio-6305, at ¶ 13. A post-conviction proceeding is not an appeal of a criminal conviction but, rather, a collateral civil attack on the judgment. *State v. Calhoun*, 86 Ohio St.3d 279, 281, 714 N.E.2d 905, 910 (1999). Therefore, a petitioner receives no more rights than those granted by the statute. Id.

**{¶82}** "Due process requires that Ohio's statutes governing petitions for postconviction relief— R.C. 2953.21 et seq.—afford an individual challenging the validity of his or her conviction a meaningful way to do so. Specifically, those provisions require a hearing once a petitioner has made a cognizable claim arguing a constitutional error. *State v. Calhoun*, 86 Ohio St.3d 279, 282-283, 714 N.E.2d 905 (1999)." *State v. McFeeture,* 159 Ohio St.3d 1468, 2020-Ohio-3885, 150 N.E.3d 123. (Donnelly, J., dissenting) (appeal not accepted for review).

**Issue for Appellate Review:** *Whether Baker received an opportunity to be heard at a meaningful time and in a meaningful manner.*

{¶83} Baker received an opportunity to be heard at a meaningful time and in a meaningful manner. Baker was given an evidentiary hearing on her petition for postconviction relief during which she was permitted to introduce expert testimony and an expert's report. Procedural due process does not require more. As we have found in our disposition of Baker's First Assignment of Error, the trial judge did listen to and consider Dr. Stinson's testimony. We do not find evidence in the record that establishes the trial judge's conduct denied Baker her right to due process. The fact that the trial judge did not adopt the expert's recommendation does not amount to a denial of procedural due process.

{¶84} Baker's Third Assignment of Error is overruled.

{¶85} The judgment of the Muskingum County Court of Common Pleas is affirmed.

By Gwin, J.,

Delaney, P.J., and

Baldwin, J., concur